**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CLAUDELL L. MACK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 04-0307-BH-B |
| ST MOBILE AEROSPACE | ) | |
| ENGINEERING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT; CONCLUSIONS OF LAW**
**AND ORDER**

This action is before the Court on defendant's motion (Doc. 27) for summary

judgment and motion (Doc. 40) to strike certain specific statements proffered by the

plaintiffs in opposition to defendant's motion for summary judgment.  Upon consideration

of these motions, plaintiffs' briefs in opposition thereto (Docs. 34 and 43, respectively),

defendant's replies (Docs. 41 and 44, respectively), and all other pertinent portions of the

record, the Court first concludes and it is therefore **ORDERED** that the motion to strike is

due to be and is hereby **GRANTED** in its entirety for the reasons stated therein.  The

defendant has demonstrated that the statements at issue are inadmissible hearsay, double

hearsay, opinion, speculation and/or conjecture and "cannot be considered on a motion for

summary judgment." *Macuba v. Deborer*, 193 F.3d 1316, 1322 (11th Cir. 1999).   In

contrast, plaintiffs merely argue that all the testimony should be considered because: (1) it

"could be reduced to admissible form at the trial of this matter," and (2) some of the

testimony may be representative "admissions by a party-opponent" under Fed.R.Evid.

802(d)(2)(D) or under some other unidentified provision of Rule 802(d)(2). Plaintiffs fail, however, to either delineate which statements fall into which alleged category or otherwise argue the point in a fashion which is not merely vague and conclusory. By contrast, defendant's position is fully supported by the record and the law.

The Court further concludes that defendant's motion for summary judgment is due to be granted for all the reasons stated therein and in defendant's reply brief (Doc. 41). In this litigation, one former and five current black employees of ST Mobile Aerospace Engineering, Inc. ("MAE") assert a variety of race discrimination and harassment claims against MAE under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII") and the Civil Rights Act of 1865, 42 U.S.C. §1981. The plaintiffs generally allege that they were subjected to a racially hostile work environment and that they were discriminated against because of their race in terms of starting pay, pay raises, promotions, demotions, discipline, job assignments or "other terms and conditions of employment." (Exh. 32, *Amended Complaint* ¶¶ 68, 78, 88 and 101).[1]

### FINDINGS OF FACT

Upon consideration of all the competent evidence of record, both documentary and testimonial, the Court finds that the following facts are either undisputed or uncontradicted by the plaintiffs.

---

[1] The plaintiffs do not dispute that they failed to allege the following claims in their *Amended Complaint* or in the "Statement of Plaintiffs' Claims" in the *Report of Parties' Planning Meeting* but, instead, raised them for the first time in their depositions: (i) George's and Wayne's starting pay claims; (ii) McDonald's and Mallory's pay raise claims; (iii) Mallory's skill level progression claim; (iv) George's denial of promotion claim; (v) George's and Wayne's claims that they were relieved of "acting" Lead Mechanic duties; and (vi) Wayne's claim that he was given discriminatory job assignments.

**MAE's Operations**

MAE operates a commercial  aircraft maintenance, repair, overhaul and engineering

facility at the Brookley airport complex in Mobile, which is subject to extensive regulation

by the Federal Aviation Administration ("FAA").  The company's facilities include aircraft

runways and ramps, eight aircraft hangars, workshops, storerooms and administrative

offices covering some 75 acres with approximately two million square feet under roof.

(Exh. 1)  MAE generally has 10 to 15 commercial jet aircraft in various stages of work in

its hangars, including 727s, 747s and 757s, and DC-10s.  (Exh. 33, Bell Dec.¶ 3)

Until recently, MAE's President was Ronnie Koh (Asian male) and its Manager of

Administration was George Bell (white male).  Dick Wellington (white male) is the

Manager of Human Resources.  All three held their positions for many years.  Bell was

Manager of Administration from the time MAE began operations in 1991 until he retired

from full time employment in January 2004.  He currently works part-time performing

duties related to the enforcement of MAE's "Equal Employment Opportunity and

Treatment" Policy (Exh. 33, Bell Dec. ¶ 2 and Exh. 2, *EEO Policy")*.  Dick Wellington has

been the  Manager of Human Resources since 1995.  Ronnie Koh became President of

MAE in 1997, the job he held until his recent resignation in February 2005.  (Exh. 33, Bell

Dec. ¶ 4)

MAE currently has 971 regular or "direct" employees and 425 contract workers.[2]

Most of MAE's employees and contract workers are aircraft mechanics with various

---

[2]  Contractors are used to supplement MAE's direct employee work force to enable MAE to respond quickly to frequent
workload fluctuations and as a means to avoid layoffs of direct employees.  (Exh. 37, Wellington Dec. ¶3, FN1).

specialties.  The mechanics are classified in one of four progressively higher  "skill levels":

Apprentice, Mechanic I, Mechanic II and Senior Mechanic (before 2002, termed Mechanic

III).   MAE also has Lead Mechanics, who are not supervisors, but who direct the day-to-day

work of their crews, relay instructions from management, evaluate mechanics' job

performance and, at times, recommend employment decisions.  MAE also appoints

"Acting" Leads, who generally are appointed temporarily for a particular project and

"Relief" Leads, who substitute for the Lead Mechanic if a Lead Mechanic is absent for any

reason.  (Exh. 37, Wellington Dec. ¶ 4, FN 1 & 2).

      MAE is organized into various departments.  The six plaintiffs' discrimination

claims in this lawsuit arise from their work as Mechanics in the Maintenance Department.

Within that department, Mechanics are classified by specialties or trades: *e.g.*, Airframe

and Power Plant or "APG" Mechanics, Avionics Mechanics, Sheetmetal Mechanics and

Interiors Mechanics.  Each specialty has its own chain of supervision under the overall

direction of the Director of Maintenance.  Mechanics generally work on "crews" headed by

"Leads."  In Avionics, Sheetmetal and Interiors, Leads report to Supervisors who report to

the Department Manager.  APG Mechanics work under "Leads" who report to "Project

Managers," who in turn report to a "Program Manager."  Program Managers and

Department Managers report to the Director of Maintenance.  A Project Manager generally

is responsible for managing all work performed on one or two specific aircraft.  A Program

Manager generally is responsible for managing all work on a particular class of aircraft

*(e.g.,* all DC-10s, Airbuses, or Boeing 727s) or all work performed for a particular

customer (*e.g.,* the Federal Express or "FedEx" Program).  (Exh. 37, Wellington Dec. ¶¶ 5-8; Exh. 33, Bell Dec. ¶¶ 5-9)**.**

### MAE Policies and Procedures

MAE has written policies and procedures (many of which are dictated by the FAA) that regulate its operations.  MAE's "Policy and Procedure Manual" ("PPM") includes employment polices for Compensation, Orientation, Standards of Conduct, Attendance, Discipline, Working Hours, Job Posting, Changes in Status or Pay, Terminations and Contract Employees, among others.  (Exh. 37, Wellington Dec. ¶ 9; Exh. 35, Rivera Dec. ¶ 3)

**Recruitment**.  As stated, MAE has several "skill levels" for Mechanics: Apprentice, Mechanic I, Mechanic II and Senior Mechanic.  Under the PPM,  new employees who are hired as Mechanics with no relevant work experience generally work without a skill level designation for the first 90 days.  After 90 days, the new hire is evaluated, and given a skill level designation based on his or her performance during that time.  (Exh. 37, Wellington Dec. ¶¶ 4 and 10; Exh. 23, PPM HR-202 "Recruitment" and HR-307 "Compensation.") Depending upon their past training and experience, Mechanics may be hired at any of the established skill levels.  (Exh. 37, Wellington Dec. ¶ 10)

**Compensation.**  MAE's PPM also covers compensation.  Pay ranges are developed for each hourly-paid position.  Each range has a minimum, mid-point and maximum pay rate.  Mechanics are paid within the pay range for their position based on their experience, skill level (where applicable) and job performance.   Apprentices with specialized training

start at $10.00 to 10.50 per hour.  Skill Level I Mechanics earn between $10.50 and

$12.00.  Skill Level II Mechanics generally earn between $12.00 and $13.50.  Senior

Mechanics earn $13.50  or more, depending on experience and performance.  Apprentices

without specialized aviation training start at $9.00 to $9.50 per hour.  When a Mechanic is

hired, Human Resources evaluates his or her skills, training and experience and assigns the

appropriate pay range and rate of pay for his or her anticipated skill level, subject to

confirmation after the first 90 days.   (Exh. 37, Wellington Dec. ¶¶ 10 and 11).

The PPM establishes several categories of premium pay.  Employees with FAA

Airframe ("A") or Powerplant ("P") licenses earn a premium of $.50 per hour for each

license (*i.e.,* $1.00 for an A&P License).   "Acting" Leads (employees who are asked to

serve as Lead Mechanic on a temporary basis) receive a $.75 per hour premium.  (Exh. 37,

Wellington Dec. ¶ 12; Exh. 23, PPM HR-307).

**Evaluations, Raises and Skill Level Progression.**  All Mechanics are informally

evaluated each month on quality, productivity and attitude.  As stated above, each newly-

hired employee receives a "new hire" or "90 day" performance review after the first 90

days on the job.   Thereafter, Mechanics are evaluated formally at least annually.[3]   The

evaluations use a scoring system from 1 to 7.  A score of 1 is "weak", 2  is "well below

satisfactory,"  3 is "below satisfactory," 4 is "satisfactory," 5 is "above satisfactory," 6 is

"well above satisfactory" and 7 is "outstanding."  (Exh. 36, Tan Dec. ¶ 6)

---

[3] Lead Mechanics are evaluated on planning, judgment and leadership.  (Exh. 36, Tan Dec. ¶ 6 FN1)

The monthly evaluations form part of the annual evaluation.   Merit pay reviews generally are conducted shortly after the annual performance review.  When management reviews employees' pay, it considers "the written performance review, written comments and/or administrative action reports (including disciplinary actions), the employee's position within his or her pay range, and the employee's attendance for the previous 12 month period, including sick leave, unpaid personal leave, late comings and absences without leave."   Excessive absences or incidents may affect the amount of an employee's merit raise.  (Exh. 36, Tan. Dec. ¶ 7; Exh. 23, PPM HR-307)

Mechanics also can earn skill-level promotions, *i.e.*, a progression from Mechanic I to Mechanic II or from Mechanic II to Senior Mechanic, which generally include pay raises.  Skill level progressions must be approved by the Department Manager based on completed "on-the-job training" ("OJT") records, practical job assignments, performance reviews, and time employed at the current skill level.  The PPM states the *general* "Promotion Guidelines to Next Skill Level:"

| SKILL LEVEL | SERVICE | AVERAGE MONTHLY EVALUATION |
|---|---|---|
| MECHANIC I TO MECHANIC II | 18 MONTHS | WELL ABOVE SATISFACTORY (5.8 or above) |
| MECHANIC I TO MECHANIC II | 24 MONTHS | SATISFACTORY/ABOVE (4.0-5.7) |
| MECHANIC II TO SR MECHANIC | 30 MONTHS | WELL ABOVE SATISFACTORY (5.8 or above) |

| MECHANIC II TO SR MECHANIC | 42 MONTHS | SATISFACTORY/ABOVE (4.0-5.7) |
|---|---|---|

(Exh. 35, Rivera Dec. ¶ 5)  If these requirements are fulfilled, the Department Manager may submit a formal request for promotion to the Human Resources Department.  A quarterly Promotion Board reviews these requests along with documentation of performance, training records and the like.  Employees are notified in writing of the Promotion Board's decision.  Those who are unsuccessful are urged to continue to strive for promotion.  At times, employees who are denied skill level promotion nevertheless receive pay raises to encourage them.  (Exh. 35, Rivera Dec. ¶ 5).

**Promotion**.  MAE's PPM has procedures for promotion to "Lead" or "Project Manager" positions.[4]  When MAE has an opening for such a position, a job notice is posted in the Human Resources Department and on ten "Communications Boards" located throughout MAE's facilities.  The notice states the position, the qualifications required and the deadline for submitting applications.   Each employee who wishes to be considered for a posted job opening completes a "job posting application," which must be signed  by a Supervisor or Manager.  The employee then must return the form to Human Resources on or before the posted deadline.  Human Resources compiles information on each applicant's performance reviews, attendance and disciplinary notes and submits the completed

---

[4] "Acting" positions are created when there is immediate need for a Lead or a higher position for a limited time.  In that situation, a permanent promotion is not made, but an "acting" position is created.  Acting positions are not considered regular jobs and are not posted.  An Acting Lead can be appointed by a Project Manager.  (Exh. 37, Wellington Dec. ¶ 13)

application and applicant data to the hiring Department Manager.  (Exh. 35, Rivera Dec. ¶ 8;

Exh. 37, Wellington Dec. ¶ 34; Exh. 22, PPM HR-205  "Job Postings").

## MAE's Equal Employment Opportunity Program

MAE has maintained an *EEO Policy* since its doors opened in 1991.  (MAE Exh. 2;

Exh. 33, Bell Dec. ¶10)  The current *EEO Policy* provides, in part, as follows: [5]

### Equal Employment Opportunity/Harassment Policy

MAE is committed to equal employment opportunity for all qualified persons. We recognize and appreciate *each* employee's work and contribution to our success.  We believe that our employees are entitled to be treated fairly and with respect.

We provide equal opportunity and equal treatment in all aspects of employment to all employees and to all applicants for employment without regard to their race, color, religion, sex (including pregnancy, childbirth and related medical conditions), national origin, age (40 and over), citizenship, physical or mental disability, or military obligations.   We will make reasonable accommodations to ensure equal employment opportunities for qualified disabled individuals.   A disabled individual is qualified for a job if he or she can, with or without reasonable accommodation, perform the essential job duties.

We expect all employees, including all supervisors and managers, to respect the feelings of fellow employees, and to treat fellow employees in a courteous and professional manner.   We will not tolerate any form of *harassment* of our employees.   Prohibited harassment includes any hostile, intimidating, offensive, insulting, demeaning, profane or vulgar words or conduct.   ***Specifically forbidden is harassment because of a person's sex, race, color, national origin, religion, age or disability.   Examples of prohibited harassment include offensive, insulting or demeaning remarks, gestures, jokes, pranks, slurs and graffiti about a person's sex, race, color, national origin, religion, age or disability.***   Harassment also includes managers' or supervisors' use of threatening, intimidating, demeaning or insulting words or actions in dealing with employees under their supervision, particularly any derogatory or demeaning comments about an employee or about an employee's job performance related to the employee's race, sex, national origin, religion, age

---

[5]  The Policy was updated in 2003, primarily to add Manager Human Resources Dick Wellington as an alternative official authorized to receive discrimination or harassment complaints under the *EEO Policy's* "Complaint Procedure."   The p revious version included Manager Administration George Bell.   In light of Bell's impending retirement at the end of 2003, both he and Wellington were designated.  (Exh. 37, Wellington Dec. ¶17 FN7).

or disability.   Harassment of our employees is forbidden and will result in disciplinary action, which may include discharge. . . .

### Complaint Procedure

**You _must_ promptly report any incident of harassment or any other violation of our EEO/Harassment Policy directly to our Manager, Administration, or Manager, Human Resources.**   You are encouraged to report any harassment in violation of our Policy to your manager or supervisor, who has a responsibility to prevent harassment and to stop it if it occurs. **However, to ensure that MAE can promptly investigate and, if appropriate, take prompt and effective action, it is essential that you promptly notify our Manager, Administration or Manager, Human Resources.**   Reporting it to your manager or supervisor is _not_ sufficient.

All managers and supervisors have a responsibility to enforce our EEO/Harassment Policy.   Our managers' and supervisors' responsibility includes immediately stopping any harassment that is observed or reported, and reporting any violations directly to the EEO Officer.   Failure to do so will result in disciplinary action, which may include discharge.

The Manager, Administration or the Manager, Human Resources, will thoroughly investigate all complaints.   The employee may be required to prepare a written report detailing the alleged harassment or any other violation of our Policy, and to sign the report.   To the extent practicable, the investigation will be confidential with due regard for the sensitive nature of such complaints.   If, after completing our investigation, we determine that a complaint is valid, we will take prompt and appropriate disciplinary action against the person or persons engaging in such conduct.   Depending upon the severity of the violation of our policy, appropriate discipline may be discharge.

We encourage you to come forward if you have a complaint and we assure you that no adverse action will be taken or allowed against any employee who in good faith reports harassment or any other violation of our _EEO Policy._

(Exh. 2) (italicized emphasis added).

During new employee orientation, MAE provides each employee with a copy of the _EEO Policy_ and orientation on the policy and the "Complaint Procedure."   Each employee, including plaintiffs, signs an acknowledgment to confirm that he or she has read, understands and agrees to comply with the _EEO Policy_.   (Exhs. 3A, 3B, 3C, 3D, 3E, 3F, 3G; Exh. 37, Wellington Dec. ¶ 18 and 19).   The _EEO Policy_ is included in the front of MAE's _Employee_

*Handbook*.    Once  again,  each  employee,  including  the  plaintiffs,  is  required  to  sign  an

acknowledgment  to  confirm  that  he  or  she  has  received,  read  and  understands  the  policies  in

the Handbook.  (Exhs. 5(a) through 5(f); Exh. 37, Wellington Dec. ¶¶ 18 and 19).  Every issue

of MAE's employee newsletter *Plane Talk* has included articles  about the *EEO Policy*.  These

articles  reaffirm  MAE's  commitment  to  its  equal  employment  opportunity,  explain  prohibited

harassment  and  employees'  right  to  be  free  from  harassment,  describe  the  steps  an  employee

must  take  to  complain  about  discrimination  or  harassment  and  encourage  employees  to  do  so.

Each  plaintiff  saw  one  or  more  of  these  *Plane Talk*  articles.   (Exh. 59, Mallory at 219-227;

Exh. 57, George at 187-193; Exh. 58, Mack at 169-174; Exh. 10, McDonald at 139-142, 210-

211;  Exh. 61,  Wayne  at  262-264,  320-321;  Exh. 57,  Carthen  at  151-156).    MAE  has  even

mailed  reminders  about  its  *EEO Policy*  to  all  employees'  homes,  including  letters  in  July,

1997,  January 2000,  February 2001,  March 2002,  August 2003  and  October 2003.   (Exh. 7;

Exhs. 13,  14,  15,  16;  Exh. 37,  Wellington  Dec. ¶ 22).     Each  plaintiff  received  such  letters

during his employment. (Exh. 57,George at 181-182; Exh. 59, Mallory at 242; Exh. 56, Carthen

at  140-148;  Exh. 58,  Mack  at  37;  Exh. 60,  McDonald  at  113-118;  Exh. 61,  Wayne  at 330-335).

MAE  also  posts  enlarged  copies  of  the  *EEO Policy*  near  the  required  EEO  compliance

posters  on ten large   communication  boards  in  areas  where  employees  are  likely  to  congregate

or  pass-by  frequently,  such  as  break  rooms  and  hallways.    (Exh. 8;  Exh. 33,  Bell  Dec. ¶ 13).

MAE's  Directors,  Department  Managers  and  Supervisors  periodically  receive  training  on  the

*EEO Policy*  and  their  role  in  implementing  and  enforcing  it.    In  addition,  MAE  has  held  several

management  retreats  for  all  high-level  managers  and  has  included  training  on  equal  employment

opportunity laws in general and the *EEO Policy* in particular at the retreats held in 1997, 1999, 2000 and 2001.  (Exh. 37, Wellington Dec. ¶ 24).  In July 2004, MAE conducted EEO training classes for all Directors, Department Managers, Supervisors and Lead Mechanics.  Each two hour class included training on equal employment opportunity law in general and MAE's *EEO Policy* in particular.  Attendees heard examples of complaints and appropriate responses. Participants were reminded of their duty to report any violation of the policy or any complaint under the policy directly to Human Resource Manager Dick Wellington.  As a Lead, plaintiff Jon George attended that training.  (Exh. 37, Wellington Dec. ¶ 25).

In 2002, MAE established an EEO Council as an additional point of contact for employees with concerns about discrimination or harassment.  The EEO Council does not replace the "Complaint Procedure" under the *EEO Policy*, but is an additional point of contact for employees who may wish assistance in communicating a discrimination or harassment complaint.  Currently, the EEO Council includes eight members in addition to HR Manager Dick Wellington (white male).  These members include 2 black employees, 2 white employees, 1 Asian employee, and 3 women.  MAE President Ronnie Koh (Asian) invited plaintiff Jon George to join the EEO Council in May 2004, but George never responded to the written invitation.  (Exh. 37, Wellington Dec. ¶ 27)   Membership on the EEO Council is voluntary but the time the members spend on the Council is paid working time. (Exh. 37, Wellington Dec. ¶ 27).

### MAE *EEO Policy*: Enforcement

Although plaintiffs take issue with the effectiveness of MAE's EEO Policy, they proffer

no evidence to refute George Bell's testimony that, during his fourteen years as Manager of Administration, he investigated hundreds of employee complaints but that few involved allegations of race discrimination or harassment.   Further, according to Bell's undisputed testimony, the few race discrimination or harassment claims MAE did receive and address included the following:

1.      In 1998, William Abrams (black male) advised the Planning Manager about racial graffiti on a restroom wall.   The Manager notified George Bell, who promptly had the graffiti removed.    Bell's investigation could not identify the person responsible for the graffiti. However, following his standard procedure, Bell posted several   "No Graffiti" bulletins in the restroom where the graffiti was found.  (Exh. 33, Bell Dec. ¶ 9; Exh. 17).

2.      A Planning Manager received a written complaint from a white female employee in 2001, complaining that her Lead, a black female, refused to train her because she was white. Prompt investigation confirmed the accusation.   The Lead was counseled on MAE's *EEO Policy* and required to confirm that she was familiar with the policy and would comply with it.  (Exh. 33, Bell Dec. ¶ 17).

3.      In 2003, contractor Michael McDaniel (black male) verbally reported to George Bell that Interiors Department Acting Supervisor John Shaw (white male) referred to McDaniel as a "nigger" while talking with another Supervisor.   Immediate investigation confirmed the complaint, although Shaw claimed that McDaniel had also used the word "nigger."   Shaw was immediately removed from his Acting Supervisor position, suspended for five days without pay and demoted from his regular Lead position to Senior Mechanic.   Management subsequently

13

decided that Shaw is not eligible for promotion to a leadership position. (Exh. 37, Wellington Dec. ¶ 35).

4.       In November 2003, Millie Williams (black female) complained to HR Manager Dick Wellington that co-worker Lynette Beasley (white female) had referred to Williams as a "nigger" while she was talking to another employee. Although Williams did not personally hear the comment, Wellington promptly investigated and confirmed the complaint. Beasley was given a written warning for violating MAE's *EEO Policy* and suspended for two weeks without pay. Williams was notified of the outcome of the investigation and the discipline imposed. Beasley wanted to apologize to Williams personally, but Williams did not want to speak with Beasley. (Exh. 37, Wellington Dec. ¶ 36).

5.       Over the last two years, MAE has received complaints from several black employees about the Confederate flag, including the display of the flag on toolboxes, baseball caps and bumper stickers.[6] In response, MAE prohibited supervisors and managers from displaying Confederate flags on their cars. MAE also published a memo to all employees explaining that the *EEO Policy* prohibited offensive racial symbols and asking employees to let Human Resources know if they encountered anything in the workplace they deemed offensive. Thereafter, MAE also required that any Confederate flags be removed from toolboxes during the routine security search before any new toolboxes are brought on MAE's premises. (Exh. 37, Wellington Dec. ¶ 37).

---

[6] The plaintiffs' *Amended Complaint* includes a number of allegations complaining about the display of the Confederate flag. (Exh. 32, *Amended Complaint* ¶¶ 49, 50, 51,52, 53). None of the complaints about the display of the Confederate flag involve a display that included other words or symbols that objectively would indicate that the display was intended to offend black employees. Nevertheless, MAE took steps to limit the displays because MAE was mindful of the sensitivity of the issue. (Exh. 37, Wellington Dec. ¶ 37).

6.      In February 2002, Quality Control Inspector Jimmy Jones  (black male) brought George Bell photographs of a rope "noose" suspended from a work stand in Hangar Eight.  Bell investigated immediately, and found that this particular piece of rope was not tied like a typical "noose."[7]  Instead it had been formed into a loop,  secured with duct tape and used to suspend air hoses to facilitate the work.  (A photograph of a rope used in a similar way at MAE earlier this year is attached as Exhibit 12).   Bell determined the rope was not displayed in a manner that would reasonably intimidate or offend employees but he reported the matter to management in the area, and warned them to be mindful that even work-related objects could appear to be offensive. (Exh. 33, Bell Dec. ¶ 18).

7.      In contrast to the above, on March 1, 2002, several  MAE employees came to work and discovered an actual "hangman's noose" suspended from a DC-10 tail stand in Hangar Six.   The noose was immediately taken down under the direction of MAE President Koh. George Bell and Vice President of Operations Mike Anderson investigated immediately, starting with a review of security camera  video tape of Hangars Four, Six and Eight.  Anderson immediately issued a memorandum to all employees stating that MAE was reviewing video tapes and  investigating to determine if MAE could "identify the culprit who has done this disservice to MAE and its loyal employees and contractors," and that the person responsible would be "terminated."   (Exh.13).   Management also conducted meetings with all employees, including the plaintiffs, reiterated that this behavior was unacceptable, and encouraged any employee with knowledge to come forward.  (Exh. 33, Bell Dec. ¶ 20)   Within days, MAE identified the two

---

[7] The rope loop had already been removed from the aircraft.

white employees who placed the noose on the aircraft.  They insisted that they had used the rope to lift and lower garbage cans to and from the aircraft, not to intimidate or offend anyone.  Even if their explanation were true, MAE concluded that the two employees had displayed unacceptably bad judgment and both were discharged.    Both are permanently ineligible for rehire.  (Exh. 37, Wellington Dec. ¶ 32; Exh. 33, Bell Dec. ¶ 21).  The employees subsequently hired an attorney, who wrote to MAE threatening legal action if they were not returned to work. Through its own attorney, MAE refused.    MAE successfully contested the two employees' unemployment compensation claims based on their discharge for "misconduct"; that is, their violation of the *EEO Policy*. (Exh. 37, Wellington Dec. ¶ 32).[8]  Shortly after the two were discharged, MAE's President Ronnie Koh wrote all MAE employees to confirm that the perpetrators had been identified and disciplined.  Koh reiterated MAE's *EEO Policy*, reaffirmed MAE's commitment to the policy, and emphasized that any employee who violated the *EEO Policy* was subject to discipline, including discharge.   Koh urged employees to come forward with any complaint or concern and assured them that such complaints would be promptly investigated and that effective remedial action would be taken.   Koh also announced the creation of an Equal Employment Opportunity Council, as yet another point of contact for employees with concerns.  (MAE Exh. 14; Exh. 37, Wellington Dec. ¶ 34; Exh. 33, Bell Dec. ¶ 22).    All of the plaintiffs knew that the two men responsible for the "noose" incident were discharged. (Exh. 59, Mallory at 175-177; Exh. 60, McDonald at 56, 101, 104, 203; Exh. 58, Mack at 122-

---

[8]  Both of the employees attended orientation where MAE'S *EEO Policy* was explained.  Each received a copy of the policy and acknowledged in writing that they had read, understood and would comply with the policy.  (Exh. 37, Wellington Dec. ¶ 18)  Prior to the episode, MAE had no information to indicate the two would violate the *EEO Policy*. Indeed, plaintiff Jon George testified that he had difficulty believing that the two employees were responsible: "[T]hey didn't seem like the type of people that would do it."  (Exh. 57, George at 108-109).

124, 128-129; Exh. 61, Wayne at 218-223; Exh. 56, Carthen at 78-79, 91-92, 145; Exh. 57, George at 100-102, 106)    From that time until MAE received the plaintiffs' EEOC charge, MAE was not made aware of any reoccurrence. (Exh. 37, Wellington Dec. ¶ 34; Exh. 33, Bell Dec. ¶ 22).

8.    MAE's *EEO Policy* specifically prohibits racial graffiti. (MAE Exh. 2, *EEO Policy*).[9]    MAE attacked the problem of graffiti in its thirty-two restrooms in February 1996 after a female employee complained about offensive sexual graffiti that her fiancé observed. At that time, MAE delivered a copy of its *EEO Policy* to all employees, together with a memorandum stating as follows:

> . . . We expect every employee to review [the *EEO Policy*] closely and abide by the policy completely.  Any employee who violates our policy, is subject to discipline, including discharge.
>
> We have encountered a problem with graffiti, including crude language and drawings, on restroom walls and facilities.  Some of the comments and drawings have been sexually degrading and vulgar.  Graffiti of this kind will not be tolerated.  Morever, defacing MAE property in any manner is strictly prohibited, regardless of the manner of the comments or drawings.
>
> We expect any employee who observes anyone violating these policies to report the violation immediately.  Please report promptly any violation of these policies to Manager of Administration George Bell.

Shortly thereafter, MAE remodeled all bathrooms to make it difficult for anyone to write or draw on the restroom walls, and began frequent management inspections of all restrooms. .

---

[9]  The plaintiffs' *Amended Complaint* includes several allegations dealing with racial graffiti.  Most of the reported graffiti has appeared on the inside walls of stalls within the men's bathrooms.  (Exh. 32, *Amended Complaint* ¶¶ 36, 44, 45, 54)  For obvious reasons, MAE cannot place video cameras in an effort to identify the culprits.

There has been less graffiti of any kind on the restroom walls since the renovations were completed, and all graffiti that has appeared has been promptly removed.    (Exh. 33, Bell Dec. ¶¶ 30 and 31) Nonetheless, MAE's President Ronnie Koh distributed a reminder letter in January 2000, to all employees and contractors regarding graffiti, referencing the reports of graffiti in some of MAE's thirty-two restrooms.    Koh urged employees to report any such misconduct to George Bell.  (Exh. 15; Exh. 33, Bell Dec., ¶ 32)  That memo was followed the next month by one from Bell reiterating the "no graffiti" policy, and encouraging employees to report graffiti and to advise management if they knew of any employee responsible for graffiti. (Exh. 16).   For several years, MAE has also posted the following policy statement on "Harassment" in general and "graffiti" in particular on all communication centers beside the *EEO Policy*:

### HARASSMENT
*Is It Worth Your Job?*

MAE will not tolerate harassment in the workplace. Specifically forbidden is harassment because of a person's sex, race, color, national origin, religion, age, or disability. . . . Harassment of our employees is forbidden and will result in disciplinary action, which may include discharge.

**Some time ago, we warned all employees that graffiti on MAE's restroom walls and facilities is prohibited, and that "any employee who writes, draws pictures, or in any other way defaces MAE property, including writing or drawing on restroom walls or facilities, will be discharged immediately." Since we issued that memorandum, we have undertaken a costly renovation of our restroom facilities and graffiti has essentially disappeared. We will not tolerate any graffiti. Any employee who violates this rule will be discharged immediately.** ***Is graffiti worth your job?***

> We expect anyone who witnesses a violation of our "EEO/Harassment Policy", including anyone who observes any person writing or drawing on the walls of our facility, to report the violation immediately to Manager Administration, George Bell.

(Exh. 18).   Manager of Administration George Bell routinely policed MAE's thirty-two restrooms for graffiti. When he found graffiti, he directed its immediate removal, and posted the following sign on the spot and outside the bathroom:

**NO
GRAFFITI**

> ANY EMPLOYEE WHO WRITES, DRAWS, OR IN ANY OTHER WAY DEFACES MAE PROPERTY, INCLUDING WRITING OR DRAWING ON BATHROOM OR OTHER FACILITY WALLS, WILL BE DISCHARGED <u>IMMEDIATELY.</u>   ANY PERSON DOING BUSINESS WITH MAE, INCLUDING ANY CONTRACTOR, WHO ENGAGES IN THESE ACTIVITIES WILL BE EXPELLED FROM MAE PROPERTY IMMEDIATELY.

> WE EXPECT ANY EMPLOYEE OR CONTRACTOR WHO OBSERVES ANYONE VIOLATING THIS POLICY TO REPORT THE VIOLATION IMMEDIATELY TO OUR MANAGER OF ADMINISTRATION.

(Exh. 17; Exh. 33, Bell Dec. ¶ 35)

9.   In September 2003, after MAE received the plaintiffs' EEOC charge, which included allegations about "racial" graffiti, the Investigator MAE retained to investigate the allegations and HR Manager Dick Wellington inspected MAE's entire facility.   The inspection discovered "Black Power" and "KKK" written on a bathroom wall, and a drawing of a Confederate flag with the written notation "Flag of Losers" on another bathroom wall.   The graffiti was removed promptly.   (Exh. 37, Wellington Dec. ¶ 40).  Shortly thereafter, MAE

President Ronnie Koh mailed another letter to all employees and contractors at home delineating the "no graffiti" policy and warning that: **"IF AN MAE EMPLOYEE IS RESPONSIBLE FOR GRAFFITI, HE OR SHE WILL BE TERMINATED.   IF A CONTRACTOR IS RESPONSIBLE FOR GRAFFITI, THE CONTRACTOR WILL NOT BE PERMITTED TO WORK ON MAE PREMISES.**"(Exh. 7, Bate stamp MAE 150) (emphasis added)   During 2004, Manager Bill Lamb assigned an employee to make daily bathroom inspections for graffiti.   The employee inspected daily and maintained a log of his inspections.   Very little racial graffiti was discovered.   When it was, the graffiti was removed promptly.   (Exh. 38, Lamb Dec.; Exh. 37, Wellington Dec. ¶ 42).   Beginning in mid-January 2005, Manager of Environmental and Security Allen Hall assigned crews to make daily inspections of MAE's thirty-two restrooms.   These crews log their findings.   MAE's daily inspections of the restrooms are ongoing.  (Exh. 34, Hall Dec.)

10.   In general, August of 2003, MAE received the EEOC charge filed by the plaintiffs in this case. In general, the EEOC charge alleged that the plaintiffs had been subjected to a racially   hostile work environment, including (1) "repeated and ongoing exposure to hanging/lynching nooses"; (2) exposure to racial graffiti, including "swastikas," "KKK," and "other symbols of racism" on MAE's premises; (3) and hearing the word "nigger" while at work. The EEOC charge further alleged that the plaintiffs had been treated differently than similarly-situated white co-workers with regard to: (1) a lack of proportionate black upper-level management employees; (2) "disparate pay"; (3) hiring white employees for "unpublished job positions"; and (4) "disparate [pay] raise and promotion standards."   The charge included no

other specifics.    (Exh. 13).    It appeared to MAE, despite the breadth and vagueness of the allegations in the EEOC charge, that many of the allegations had never been asserted as complaints under MAE's *EEO Policy*.[10]    Accordingly,  MAE treated the plaintiffs' EEOC charge as a complaint under the *EEO Policy,* and retained Hunter Security to conduct an investigation, which lasted almost 12 weeks.[11]    HR Manager Wellington wrote each plaintiff a letter explaining that MAE would treat the charge as a complaint under the *EEO Policy* and asking each one to meet with investigator Hunter.    (Exhs.10a-10g).    Thereafter, Hunter conducted thorough interviews of each plaintiff, with plaintiffs' attorney.    Each plaintiff provided a lengthy statement describing his complaints in detail.[12]    Based on these statements, Hunter interviewed other witnesses and reviewed MAE records, which, in turn, prompted additional witness interviews and additional records to be reviewed.    Ultimately Hunter submitted a detailed investigative report to MAE President Ronnie Koh. (Exh. 37, Wellington Dec. ¶¶ 38, 39, 43). Upon the conclusion of the investigation, HR Manager Wellington wrote each plaintiff detailing the results of the investigation and inviting each to meet with him personally to address any remaining concerns.    Each plaintiff received Wellington's letter, but none asked to meet with Wellington.  Instead, plaintiffs filed this lawsuit. (Exh. 25; Exh. 37, Wellington Dec. ¶ 46)

---

[10]   The EEOC charge named a seventh charging party, Michael McDaniel (black male), a contractor who was no longer working at MAE.  McDaniel is not a plaintiff in this case.

[11]   Hunter Security is a private investigation firm whose agents share over 100 years of FBI and related investigation experience.   George (Buddy) Hunter was primarily responsible for the MAE investigation. (Exh. 37, Wellington Dec. ¶ 39FN10).

[12]   In their depositions in this lawsuit, the plaintiffs raised many additional complaints that were not included in their EEOC charge or in the detailed interview statements that they provided to Investigator Hunter.   The additional complaints are addressed below.

**Plaintiffs' Hostile Environment Claims**

Each plaintiff claims that he was subjected to a racially hostile work environment "characterized by the pervasive use of racial slurs and offensive symbols" over a period of several years. (Exh. 32, *Amended Complaint* at ¶¶ 18-55).  The evidence proffered in this case, however, establishes that the plaintiffs complain principally about comments they heard had been directed to co-employees, not to the plaintiffs themselves.   For example, all plaintiffs heard about the incident described above in which Acting Supervisor Shaw referred to Mike McDaniel as a "nigger."   It is undisputed that MAE immediately investigated this matter and promptly took appropriate action against Shaw.   Most of the remaining incidents complained about by the plaintiffs in this litigation were never reported under MAE's *EEO Policy*.   The few that were reported, were promptly investigated and responded to  by MAE.  (Exh. 37, Wellington Dec. ¶ 30; Exh. 33, Bell Dec. ¶ 15).  As to specific allegations, the Court finds as follows:

1. ***Theodore Carthen***.

Carthen began work at MAE as a contractor in November 1997.   Even though Carthen claims racial incidents occurred before August 2002, he testified that he was happy at MAE during his five years as a contractor and, consequently, he applied and was hired as a direct employee in  August 2002.  According to Carthen, he was fully capable of performing all of his job duties at MAE, and nothing prevented him from doing so.  (Exh. 56, Carthen at 29-30).

Carthen testified that he found a "slip knot" noose made of yellow rope on the tail stand of a DC-10 in Hangar 3 in February or March 2002.   According to Carthen, this noose was

neither the looped rope secured by duct tape found in Hanger 8 on February 22, 2002, which was fully investigated, nor the "hangman's noose" found in Hanger 6 on March 1, 2002, which resulted in an investigation and the termination of two employees. (Exh. 56, Carthen at 70-73. Carthen testified that he promptly removed the noose but did not report it to anyone. (Exh. 56, Carthen at 91-92, 145). Carthen heard about the noose in Hangar 6 and was aware of MAE's prompt response, including the discharge of the responsible employees. (Exh. 56, Carthen at 78-79, 91-92, 145).

Carthen saw "KKK" written on the inside wall of a stall in one of the men's restrooms several times in September 2001. Although Carthen contends that this graffiti stayed for approximately one month, he concedes that he never reported the graffiti. (Exh. 56, Carthen at 93-94)

According to Carthen, on one occasion, co-employee Tony Kimball (white) said to him: "hey, what's up my nigger?" Carthen believed Kimball was trying to be friendly, so he asked him not to use that word and Kimball agreed. Carthen did not report Kimball's comment. Kimball never used that word again. (Exh. 56, Carthen at 103-119). Carthen has heard other black employees call each other "nigger," and he has heard white employees say things like "your black ass" to black employees. Carthen never reported these comments to management. (Exh. 56, Carthen at 106-107, 124, 179).

Carthen finds the Confederate flag offensive. He testified that he saw the Confederate flag on t-shirts, toolboxes and tattoos at MAE before October 2001. More recently, Carthen saw a Confederate flag decal on his Relief Lead's toolbox. The Relief Lead has always treated

Carthen fairly, and Carthen does not believe he is a racist.  Carthen never complained about a

Confederate flag until his deposition.   (Exh. 56, Carthen at 92, 97-100, 102, 172-174, 177,

184).      When, during Carthen's deposition, Human Resource Manager Wellington first heard

about the flag on the Relief Lead's toolbox, he investigated and learned that the Relief Lead did

have a small (approximately 2 inches) Confederate flag decal on his toolbox.   (The decal is Exh.

28; Toolboxes are shown in Exhibit 30).      Wellington ordered the immediate removal of the

decal on the Relief Lead's box.  (Exh. 37, Wellington Dec. ¶ 47).

     2.   ***Jon George***

George has been employed at MAE since September 1999.  He was promoted to Lead

Mechanic in 2003, the job he now holds.   According to George, he is   fully capable of

performing all of his job duties at MAE satisfactorily and nothing has prevented him from doing

so.  (Exh. 57, George at 218-219).

George saw the March 1, 2002, "hangman's noose" in Hangar 6, and he was aware of

MAE's prompt response, including the immediate termination of the two employees involved.

George never saw any other noose on MAE's premises.  (Exh. 57, George at 100-102, 106).

George saw racial graffiti on the restroom walls in Hangars 1 and 2 in mid-2003,

including "swastikas" and "KKK."  He complained to Lead Charles Tanks (black), who had the

graffiti removed the same day.  (Exh. 57, George at 21, 24, 110-112). George saw the word

"nigger" on a restroom wall in Hangar 5 in October 2004.  He did not report it.  (Exh. 57,

George at 113-115).   George also saw the word "nigger" written on an aircraft parts rack in

Hangar 5 in May 2004.  He did not report it because he believed plaintiff Claudell Mack was going to do so.  However, Mack did not report the graffiti because he was collecting evidence for his lawsuit.  (Exh. 58, Mack at 138-39). George candidly admits: "I cannot think of any time when I reported racist symbols that were not removed."  (Exh. 57, George at 114-152)

George has only heard one racial slur at MAE.  (Exh. 57, George at 124, 125). He heard co-employee Leo Guthrie (white) tell a joke that included the "N" word.  (Exh. 57, George at 133-134). Lead Mechanic Bill Barnes (white) overheard the joke, took Guthrie aside and reprimanded him.  Guthrie never used that word again (Exh. 57, George at 133, 134). George did not report Guthrie's joke to MAE management.  (*Id*.)

George testified that, beginning in 2003, "there used to be a rash" of Confederate flag stickers on toolboxes.  He also saw Confederate flag decals on vehicles in MAE's parking lot. After MAE President Koh wrote a letter about the display of symbols that could offend co-workers, the decals on Supervisors and Managers vehicles were removed.[13] (Exh. 57, George at 117-122; Exh. 7, Bate stamp MAE 148); Exh. 37, Wellington Dec. ¶ 13)

George heard that black female co-worker Millie Williams had been referred to as a "nigger" by  white female co-worker Lynette Beasley in November 2003.  The black co-worker reported the incident to HR Manager Wellington who conducted an immediate investigation. George and Clarence McDonald met with HR Manager Wellington to express their concern about the incident.  The employee who made the comment was suspended for two weeks without

---

[13]   MAE Supervisors and Managers have parking spaces within the security fence on MAE's premises.  All other employees park in a large parking lot outside of the fence.  MAE banned Confederate flag decals and licenses on all vehicles parking within the security fence.  (Exh. 37, Wellington Dec. ¶ 13; Exh. 7, Bate stamp MAE 148).

pay for violating the *EEO Policy*, and she was required to review MAE's *EEO Policy*. (Exh. 37, Wellington Dec. ¶ 36).

### 3.    *Damon Wayne*

Wayne started work in January 2001. He worked for MAE until May 2004 when he voluntarily resigned. Wayne does not claim that his resignation was anything other than voluntary. According to Wayne, he was fully capable of performing all of his job duties at MAE, and nothing prevented him from doing so. (Exh. 61, Wayne at 41 and 42).

Wayne saw the "hangman's noose" in Hangar 6 on March 1, 2002. He was aware of MAE's prompt response, including the fact that the two employees involved were fired. (Exh. 61, Wayne at 218-223). Wayne also saw a noose hanging from a work station in Hangar 8 in November 2002.[14] As he approached the noose, Wayne heard Lead Quinn Holbrook (white), say "that's for them. . .the niggers." According to Wayne, Quality Control Inspector Jimmy Jones (black male) took photographs of the "noose." Wayne reported it to Avionics Supervisor Nemecek (white), who asked Holbrook if he made the comment. Holbrook denied it. Neither the Avionics Supervisor nor Wayne ever reported the comment to HR Manager Wellington or Administration Manager Bell. (Exh. 61, Wayne at 200-205, 209-212; Exh. 33, Bell Dec. ¶ 19).[15]

---

[14] Due to the similarities between the reported February 22, 2002 incident and this new testimony about a November 2002 incident, MAE believes that Wayne is mistaken about the date. However, for purposes of summary judgment, the Court accepts Wayne's account that the incident occurred in November 2002.

[15] The Avionics Supervisor's failure to report the incident violated MAE's EEO Policy, which *requires* Supervisors to report all incidents brought to their attention. HR Manager Wellington and Administration Manager Bell were not aware of the Supervisor's failure to report the incident until much later when Wayne recounted the incident after the plaintiffs filed their EEOC charge in late 2003. (Exh. 33, Bell Dec. ¶¶ 18 and 19; Exh. 37, Wellington Dec. ¶¶ 44 and 45)

26

Neither Administration Manager Bell nor HR Manager Wellington was aware of the alleged second noose in Hangar 8 until Wayne described the incident during his interview with Investigator Hunter in 2003.   Wayne initially told Hunter that the incident occurred in late 2001 or early 2002.   After Wayne reported the incident to Hunter, Wellington investigated further. Lead Quinn Holbrook recalled that Wayne had mentioned a "noose" in the past, but that Wayne was referring to a yellow safety rope that was tied to a slip knot and used to hold back wires while MAE employees worked in the area.   Holbrook again denied making any racial comment. QC Inspector Jones had taken photographs of the February 2002 "noose," *i.e.,* the looped rope secured with duct tape that was used to hold air hoses and Jones had provided photocopies of those photographs to Administration Manager Bell.   Based on his investigation, Wellington concluded that Wayne must have been referring to the February 2002 looped rope which had been fully investigated by Bell at the time it occurred.   Nevertheless, Holbrook was counseled about the seriousness of the *allegation* and reminded of his obligations under MAE's *EEO Policy*.  (Exh. 37, Wellington Dec. ¶¶ 44 and 45; Exh. 33, Bell Dec. ¶¶ 18 and 19)[16]

In deposition Wayne testified that this noose was in Hangar 8 in *November* 2002, not late 2001 or early 2002 as was first reported.   Bell investigated again.   Jones confirmed that he had only taken photographs of a "noose" in Hangar 8 once.   Consequently, MAE believes that Wayne's incident actually occurred in February 2002 and was fully investigated at that time.

---

[16]   In his deposition in late 2004, Wayne testified that this alleged noose incident occurred in November 2002, not February 2002, and he reiterated that QC Inspector Jones photographed the same.  In a follow-up interview with Jones (black), Jones confirmed that the only photographs he took were those he took in February 2002 (the looped rope used to secure airhoses), and he provided Administration Manager Bell with the actual disc containing the original photographs.  (Exh. 33, Bell Dec. ¶¶ 18 and 19)

For purposes of summary judgment, the Court credits Wayne's testimony that the incident occurred in November 2002. (Exh. 33, Bell Dec. ¶ 19)

Wayne testified that he also saw a small black figurine with a noose around its neck on a toolbox in Hangar 3 or Hangar 5 in September 2003 (*i.e.,* a few months after the plaintiffs filed their EEOC charges). He immediately reported the incident to Administration Manager Bell, who made a comment about his impending retirement and took no further action. (Exh. 61, Wayne at 224, 237-38, 240-42).[17]

Wayne saw racial graffiti on a number of occasions: (i) in September 2003, Wayne saw swastikas on a restroom wall accompanied by the notation "wish the damn janitors would clean this place up, damn monkeys," and he saw "KKK" and "black power" written on a different restroom wall (Exh. 61, Wayne at 270-71); (ii) Wayne saw "KKK" and swastikas written on the restroom walls in four other hangars and at unidentified times; (iii) Wayne observed swastikas and "KKK" on toolboxes in Hangar 7 and on tables in break rooms (Exh. 61, Wayne at 272-78); (iv) in February 2004, Wayne saw the notation "it's black history month, we ain't going to go to the Mardi Gras ball" on a restroom wall, with the word "black" scratched out and the word "mooley" substituted (Exh. 61, Wayne at 274-76); and (v) in April or May 2004, Wayne saw racial graffiti on a locker inside the Hangar 1 break room. (Exh. 61, Wayne at 278-79). According to Wayne, he brought the offensive graffiti to Administration Manager Bell's

---

[17] The *Amended Complaint* alleges that the incident occurred in late April 2004 (Exh. 32, *Amended Complaint* ¶42); *i.e.,* several months *after* Bell retired effective December 31, 2003. In deposition, Wayne changed his story and testified that the incident occurred in mid-September 2003, shortly before Bell retired. Bell denied that he ever received any such report from Wayne. (Exh. 33, Bell Dec. ¶ 25) For the purpose of summary judgment, the court accepts Wayne's testimony.

attention on one occasion in March 2003, and Bell promptly directed MAE personnel to remove the graffiti.   Wayne did not report graffiti on any other occasion.  (Exh. 61, Wayne at 267-68)

No one has ever called Wayne a "nigger" at MAE.   (Exh. 61, Wayne at 289).   However, Avionics Leads Robert Craft (white) and Quinn Holbrook (white) called him "boy" in August 2001. (Exh. 61, Wayne at 336, 371).  He complained to Supervisor Gerald McAdams (white) about Craft's comment, but no action was taken.   (Exh. 61, Wayne at 76, 91, 92).[18]   Lead Robert Craft also called Wayne "boy" during a meeting he requested with Project Manager Sam Mendenhall in August 2001; Mendenhall took no action.  (Exh. 61, Wayne at 70, 76, 366).[19] Wayne did not report either incident to the HR Manager or the Administration Manager.   (Exh. 33, Bell Dec. ¶ 26)

Once in 2002, Avionics Supervisor Gerald McAdams (white male) asked Wayne: "How's my favorite token?"   (Exh. 61, Wayne at 311).   Wayne reported McAdams to Avionics Manager Charlie Generro (white male), who said he would "look into it and take care of it."   When Wayne followed up with Generro a week or so later, Generro told him it had been "handled."   McAdams has not made any racial comments to Wayne since that time.   Wayne did not otherwise report the comment.  (Exh. 61, Wayne at 311 and 364).

Indeed, Wayne never complained about any racial comments under the "complaint

---

[18]   McAdams denies ever receiving such a complaint from Wayne, who did not work under his supervision.   (Exh. 46, McAdams Dec. )  For the purpose of summary judgment, the court accepts Wayne's testimony.

[19]   According to Mendenhall, no such meeting ever occurred.   Neither Craft nor Wayne worked for Mendenhall during that time and there would have been no reason for him to meet with the two.   For the purpose of summary judgment, the court accepts Wayne's testimony. (Exh. 51, Mendenhall Dec.)

procedure" in MAE's *EEO Policy*.  (Exh. 33, Bell Dec. ¶ 26)

Wayne testified he heard Acting Supervisor John Shaw (white male) call contract worker Mike McDaniel "nigger."  As discussed above,  McDaniel reported Shaw's comment to management and Shaw was removed from his Acting Supervisor position, permanently demoted from Lead to Senior Mechanic and suspended for five days without pay. (Exh.37, Wellington Dec. ¶35)

When Wayne reported for his interview with Investigator Buddy Hunter, he overheard Administration Manager Bell say "I'll be glad when we can get rid of all of them."   Wayne believes Bell was referring to the plaintiffs.  (Exh. 61, Wayne at 295-297).  Bell denies any such remark.   Except for Wayne, who voluntarily quit his employment with MAE several months later, all plaintiffs are currently employed at MAE.  For the purpose of summary judgment, the court accepts Wayne's account.

Wayne saw a "rebel" flag on Supervisor Lloyd Hodges' automobile and a rebel flag tattoo on Hodges' arm; Hodges is the same Supervisor who recommended Wayne for a skill level promotion to Senior Mechanic three months before Wayne was eligible under MAE's guidelines.  Wayne did not report the rebel flag decal or tattoo to anyone.  (Exh. 61, Wayne at 26).  In deposition, Wayne also complained that MAE did not enforce its uniform policy fairly. On one occasion, Wayne was asked to remove a cap with an American flag on it, while Lead Quinn Holbrook was allowed to wear a cap with a rebel flag and Administration Manager Bell

was allowed to wear a straw hat.  (Exh.61, Wayne at 284-86).[20]  Wayne never complained about this disparate treatment under MAE's *EEO Policy*.  (Exh. 33, Bell ¶¶ 25 and 26)

    4.    ***Claudell Mack***

Mack began work at MAE in late January 2001.  According to Mack, he has performed all of his job duties satisfactorily.  He is fully capable of doing so, and nothing has preventing him from performing his job duties satisfactorily.  (Exh. 58, Mack at 41-42).

Mack saw the February 2002 "noose" in Hangar 8 (the looped rope secured with duct tape, used to suspend air hoses).  (Exh. 58, Mack at 118-121, 126-128).  He heard about the March 1, 2002 noose in Hangar 6, but he did not see it.  Mack knew that MAE promptly investigated and that the responsible employees were terminated.  (Exh. 58, Mack at 122-124, 128-129)

Mack saw racial graffiti several times: (i) he saw the letters "KKK" on a restroom wall in Hangar 6 in 2001, and a swastika and "KKK" on the restroom wall in a different hangar sometime in 2002 (Exh. 58, Mack at 176); (ii) Mack saw unspecified racial graffiti on a parts rack in Hangar 5 in 2004.  (Exh. 58, Mack at 132-33, 176).  Mack never reported the graffiti. In deposition, he testified he did not report the latter incident because he was collecting evidence for his lawsuit.  (Exh. 58, Mack at 134, 138, 176).

In June 2003, Mack learned that Joshua Frye (white) had been promoted from Apprentice to Mechanic after six months on the job.  (Exh. 58, Mack at 145).  Mack had been promoted

---

[20] Bell wore a straw hat at work because he had skin cancer surgery on his face and his doctor advised that he should always wear a wide-brimmed hat when in the sun.

from Apprentice to Mechanic about a year earlier.  (Exh. 36, Tan Dec. ¶9).  When Mack asked Lead Quinn Holbrook why Frye and two other white Apprentices had been promoted to Mechanic in six months, while it took Mack 18 months to be promoted to Mechanic, Holbrook responded: "I'll tell you the fucking problem, Mack, you're the wrong fucking color."  Mack had never encountered any problem with Holbrook, and he considered Holbrook's monthly evaluations of his performance to be fair, indeed higher than those he received from other Leads.  (Exh. 58, Mack at  89).  Mack reported Holbrook's comment to Avionics Manager Phil Mixon and to Administration Manager Bell.  (Exh. 58, Mack at 147).  Mixon met with Mack privately to discuss his complaint and stressed to Mack that he was a valued member of the team and that his 2002 promotion to Mechanic had not been delayed because of his race.  (Exh. 58, Mack at  148).[21]   George Bell obtained a written statement from Holbrook, who admitted making the comment, but explained that he was "joking."  (Exh. 33, Bell Dec. ¶27).  At Bell's direction, Project Manager Mixon warned Holbrook that his statement violated MAE's *EEO Policy* and was unacceptable in the workplace.  Mixon reviewed the *EEO Policy* with Holbrook, who was required to sign an acknowledgment that he had re-read and understood the Policy.  In addition,  Holbrook personally apologized to Mack.  Mack accepted his apology.  (Exh. 33, Bell Dec. ¶ 27; Exh. 58, Mack at 150).  The next day, Holbrook gave Mack an assignment and a co-worker commented that Mack was "getting all the good jobs now."  Another co-worker then replied "He's the token guy on our crew."    (Exh. 58, Mack at 156).  Mack did not report the

---

[21]   As discussed below, Mack was promoted from Apprentice to Mechanic approximately one year earlier in August 2002.  Mack did not work under Lead Holbrook's direction prior to his August 2002 promotion, so Holbrook played no part in that decision.  (Exh. 36, Tan Dec. ¶ 9)

comment to anyone. (Exh. 58, Mack at 186).   No other Lead, Supervisor, Manager or co-employee has made a racial remark to or about Mack.  (Exh. 58, Mack at 89)

Mack observed a sticker on a toolbox sometime in 2004 with the words "kiss my rebel ass," and he saw a "rebel" bumper sticker on Manager Bob Holloway's vehicle sometime in 2004.  (Exh. 58, Mack at 137-138). Mack also observed a rebel flag tattoo on the left arm of his current supervisor, Lloyd Hodges, although he admits that he has always been treated fairly by Hodges.  (Exh. 58, Mack at 140). Until his deposition, Mack never reported these symbols to MAE.   (Exh. 37, Wellington Dec. ¶ 65).    Following Mack's deposition, HR Manager Wellington investigated the reported "rebel" bumper sticker on Holloway's truck, and learned that it had been removed several months earlier.  (Exh. 37, Wellington Dec. ¶ 49).

5.    *Clarence McDonald*

McDonald has worked for MAE since August 1999.   According to McDonald, he has satisfactorily performed all of his job duties at MAE, and nothing has prevented him from doing so.    His performance evaluations all have been "above satisfactory" and "well above satisfactory."  (Exh. 60, McDonald at 40, 225-226)

McDonald saw both the February 2002 "noose" that was used to support air hoses, and the March 2002 "hangman's" noose.   He was aware of MAE's response to the latter incident, including the fact that the two employees involved were terminated.   (Exh. 60, McDonald at 56, 101, 104, 203).

Around May 2003, co-worker Hezekiah Hicks (black) told McDonald about small wire

33

nooses in his work area. McDonald accompanied Hicks to the area and saw two small nooses made from safety wire. Neither McDonald nor Hicks reported the wire "nooses" to management, and neither made a complaint under the *EEO Policy*. (Exh. 60, McDonald at 115-119).

Near the end of 2003, McDonald saw three photographs taken by QC Inspector Jimmy Jones depicting nooses near the top of a hangar in a dark area. McDonald never reported the photographs. (Exh. 60, McDonald at 200-201)[22]

McDonald never heard a racial slur at MAE. (Exh. 60, McDonald at 121-22, 134-35). However, he did see offensive graffiti "one time or another" in the men's restrooms (Exh. 60, McDonald at 119): (i) he saw racial slurs and racial jokes in the men's restroom in Hangar 5 in early 2001 (Exh. 60, McDonald at 56-60); (ii) at times, he saw the "N" word in restrooms, on picnic tables and on parts tables (Exh. 60, McDonald at 119); (iii) he saw "KKK" on a restroom wall and on a parts rack in May 2004 (Exh. 60, McDonald at 120); and (iv) he saw the "N" word on a lunch table in December 2004. (Exh. 60, McDonald at 120). McDonald acknowledged that he had received the letters MAE President Koh wrote about MAE's enforcement of the *EEO Policy* with regard to graffiti. Although he at times reported graffiti to his Leads, he never reported it to management and he never reported it under the "complaint procedure" in the *EEO Policy*. (Exh. 60, McDonald at 56)

---

[22]   As stated above, QC Inspector Jones took only one set of photographs, those that depicted the rope loop secured by duct tape that was used in performing work in February 2002. Photocopies of these photographs were provided to Administration Manager Bell at that time. The photocopies appear similar to those McDonald described that he saw in 2003. (Exh. 33, Bell Dec. ¶¶ 18 and 19; Exh. 11).

McDonald saw rebel flag stickers on tool boxes (Exh. 60, McDonald at 221, 252); he observed white employees wearing rebel flag caps and t-shirts in May 2004 (Exh. 60, McDonald at 251); and he saw a rebel flag sticker on Manager Bob Holloway's truck in January 2005. (Exh. 60, McDonald at 248-249, 252-253). Although he considered the rebel flag to be offensive, he never reported the stickers, decals or clothing to management, and he never complained about the "rebel" flag decals or clothing under MAE's *EEO Policy*. (Exh. 60, McDonald at 57)

McDonald put a letter dated April 1 and captioned "Racism at Mobile Aerospace Engineering" in the Suggestion Box near Bell's office.   McDonald generally asserted that minority employees found it difficult to work productively in MAE's environment.   He gave no specifics.   Administration Manager Bell found the letter on May 1, 2003.   He replied to McDonald the same day.   By follow-up letter a week later, Bell reiterated that MAE "does not tolerate or allow racism in any form" and encouraged McDonald to make an appointment to review and identify any particular employment decisions or offensive conduct so MAE could investigate.   According to McDonald, he later visited Bell, but Bell was too busy to meet and he advised McDonald that he would follow up with McDonald later.   He never did so, and McDonald made no further effort to see Bell about that matter.   (Exh. 60, McDonald at 234-235; Exh. 33, Bell Dec. ¶ 23; Exh. 9)[23]

McDonald made a second written complaint in October 2003 about race discrimination, mostly directed at others.   Administration Manager Bell investigated the complaint promptly

_____

[23]   According to Bell, he *never* heard back from McDonald after he wrote asking McDonald to make an appointment to discuss any specifics.   (Exh. 33, Bell Dec. ¶ 23)   For the purpose of summary judgment, the court credits McDonald's account.

and thoroughly but found no EEO violation.   Bell inadvertently failed to inform McDonald of the outcome of the investigation.  (Exh. 33, Bell Dec. ¶ 24)

6.   ***Earl Mallory***

Mallory has been employed at MAE since 1997.   He testified that he has always satisfactorily performed his job duties at MAE and that nothing has prevented him from doing so.  (Exh. 59, Mallory at 36-37)

According to Mallory, he found a "noose" in a restroom in late 1997.  He took the noose down, untied it, and threw it away without reporting it.   MAE was never notified of the alleged noose.  (Exh. 59, Mallory at 168)    Mallory also saw the "noose" in Hangar 8 in February and the hangman's noose in Hangar 6 in March 2002.  He was aware of MAE's response to the latter incident, and he knew the two employees responsible were discharged.   (Exh. 59, Mallory at 175, 177)

According to Mallory, on May 16, 2003, co-worker Bill Hughes made racial remarks to him.   He reported Hughes' remarks to Administration Manager Bell, and to Interiors Lead Tommy Buckmaster (white).  (Exh. 33, Bell Dec. ¶ 28).  Buckmaster, in turn, advised Interiors Supervisor Greg Czarnecki (white), who advised Manager of Interiors Sam Mendenhall. Mendenhall suspended Hughes pending investigation, and also reported the complaint to Administration Manager Bell, who investigated.   Hughes denied making the remarks; there were no other witnesses.   Hughes also charged that Mallory made inappropriate remarks to him. Upon completion of the investigation, MAE counseled Hughes on the *EEO Policy,* and

suspended him for one week without pay. (Exh. 39, Buckmaster Dec.; Exh.51, Mendenhall Dec.; Exh. 41, Czarnecki Dec.; Exh. 33, Bell Dec. ¶28).

Mallory saw the words "nigger go home" written on a restroom wall "somewhere" three or four years ago. (Exh.59, Mallory at 241). He also saw racial graffiti on a parts rack in 2003 or 2004, the same graffiti Claudell Mack was collecting as evidence for the lawsuit. (Exh. 59, Mallory at 214). At unspecified times, Mallory saw other racial graffiti, such as "stick people" with nooses around their necks and the letters "KKK." (Exh. 59, Mallory at 184). Mallory was aware of MAE's response to graffiti and efforts to eliminate it, but he never reported the graffiti. (Exh. 59, Mallory at 184)

Finally, in his deposition, Mallory testified that he had observed symbols of racism "everywhere" at MAE.    (Exh. 59, Mallory at 187). He identified the following: (i) according to Mallory, HR Manager Wellington has a Confederate flag on his car bumper (Exh. 59, Mallory at 187-188); (ii) Mallory saw a Confederate flag bumper sticker on Manager Bob Holloway's car in January 2005 (Exh. 59, Mallory at 23); and (iii) he saw rebel flags on toolboxes at MAE. (Exh. 59, Mallory at 240). Mallory did not report these symbols before his deposition. (Exh. 59, Mallory at 119-121)

During a break in Mallory's deposition, the parties confirmed that Wellington in fact had an American flag sticker on his car, not a Confederate flag. The bumper sticker was a present from Wellington's grandson after the September 11th terrorist attack. (Exh. 37, Wellington Dec. ¶ 48). After the "facts" were pointed out to Mallory when his deposition resumed, Mallory admitted he was wrong, but persisted that the American flag sticker "appear[ed] to be something

in - along the lines of the [flag] that [he had] seen up close on toolboxes . . . .It just appeared to be the same - along the same lines as the stickers [he had] seen on toolboxes, bumpers." (Exh.59, Mallory at 189)

### Claims Concerning Discriminatory Terms and Conditions of Employment

Plaintiffs allege as follows: (I) **Mack, George** and **Wayne** claim that their starting pay with MAE was less than that of similarly-situated white employees; (ii) **Carthen, McDonald** and **Mallory** claim that they received lower pay raises than similarly-situated white employees; (iii) **Mack, Wayne** and **Mallory** claim that they were discriminatorily denied non-competitive promotions to higher skill levels; that is,  progression from one skill level to the next higher skill level; (iv) **Carthen** claims that he was discriminatorily denied a promotion to Lead Mechanic, while **George** claims that he was discriminatorily denied promotion to Project Manager; (v) **McDonald** claims that he was discriminatorily subjected to disciplinary actions; (vi) **Wayne** and **George** claim they were relieved of "Acting" Lead duties because of their race; and finally (vii) **Wayne** claims that he and other black employees were required to take "credit time" or "time off" when work was slow, while similarly-situated white employees were not, and that he was given discriminatory job assignments. Many of these claims were not alleged in the plaintiffs' lawsuit complaint.  Nevertheless, the Court has addressed each claim.

**(1).    Mack, George & Wayne Starting Pay Claims.**

*Mack's Starting Pay Claim.*

Mack claims his Apprentice starting pay of $9.50 was less than fellow Apprentices

Joshua Frye (white) and Matthew Wicks (white), both of whom were hired at $10.50 per hour, and less than Michael Musante (white), who was hired at $11.00 per hour. (Exh. 34, Amended Complaint ¶ 65; Exh. 58, Mack at 92-93). Mack claims the distinction was due to race but the uncontroverted facts establish that Mack and the three white comparators were not similarly-situated.[24] There is no evidence that any similarly situated white employee was treated more favorably than Mack.

Mack graduated from the Southeast College of Technology with an Associates degree in electronics. He had no aircraft experience. His starting pay of $9.50 per hour was consistent with MAE's PPM guidelines for an Apprentice without specialized aviation training or experience. Mack received a raise to $10.00 per hour after his first six month evaluation was "satisfactory." (Exh. 37, Wellington Dec. ¶ 55)

Frye and Wicks graduated from the Pittsburgh School of Aeronautics, an accredited aeronautics and avionics school accepted throughout the aviation industry as one of the highest quality schools in the nation. Aeronautical and avionics training is valuable to MAE. Apprentice Mechanics with that education start at a higher rate of pay than those without it. In addition, Frye held FAA Airframe and Powerplant licenses. (Exh. 37, Wellington Dec. ¶56) FAA Airframe and Powerplant licenses are similarly valuable to MAE. Apprentice Mechanics who hold such licenses start at a higher rate of pay than those who do not. (Exh. 37, Wellington Dec. ¶ 56) Frye's and Wick's starting pay was consistent with MAE's PPM guidelines and fully

_____

[24] For the first time, in response to MAE's motion for summary judgment, Mack identifies Larry Givens as an alleged comparator. There is, however, no admissible evidence in the record concerning Given's starting salary. Mack's hearsay testimony about what someone else told him is insufficient.

supported by their qualifications.  (Exh. 37, Wellington Dec. ¶ 56)

Michael Musante (white) was hired as an Avionics Mechanic I at a rate of $11.00 an hour based on his military experience and apparent qualifications.   After his 90-day evaluation reflected that he was not performing at the requisite skill-level for an Avionics Mechanic, his classification was lowered to "Apprentice."   Consistent with MAE's general practice in such cases, however, Musante's pay was not adjusted.   Instead, he was given one year to attain promotion to the skill level for which he was hired (*i.e.,* Mechanic I).   He subsequently did so. Musante received no pay increases during that year.  (Exh. 36, Tan Dec. ¶ 15)

### George's Starting Pay Claim.[25]

To the extent that George ever asserted that his starting pay was less than Darren Macip (white male), who was hired the same day, he has now conceded that "they were both were hired **at the same rate of pay**."  (Plaintiffs' Opposition Brief at 21).   George has thus abandoned any claim to the contrary.

### Wayne's Starting Pay Claim.[26]

When Wayne applied to MAE for work  as an "Aviation Electrician" in December of 2000, he interviewed with recruiter Jim Kelly (white), Lead Steve Eisler (white) and Avionics Manager Charlie Generro (white).   (Exh. 61, Wayne at 19,  23)   During his interview, Wayne asked Lead Eisler about the pay ranges at MAE.  According to Wayne,  Eisler said that Wayne

---

[25] George did not allege this claim in his lawsuit complaint.

[26] Wayne did not allege this claim in his lawsuit complaint.

would be hired as a Mechanic II making $14.00 to $16.00 per hour and that Mechanic II was the *highest* skill level for Mechanics at MAE.  Wayne was hired as an Avionics Mechanic II at a rate of $13.00 per hour.  He bases his claim on Eisler's alleged statement that he should have been paid between $14.00 and $16.00.

In fact, MAE has four skill levels for Mechanics, including Apprentice, Mechanic I and II, and Senior Mechanic.[27]   Although Wayne served in the Navy for 14 years as a technician, he was never a mechanic and he had no experience with large commercial aircraft.     Accordingly, MAE offered Wayne a job as an Avionics Mechanic II, *not* as a *Senior* Mechanic.  Wayne's starting pay of $13.00 per hour was well above the mid-point of the pay range for Mechanic II, which is $12.00 per hour to $13.50 per hour.    Wayne's starting pay was based on his qualifications. (Exh. 37, Wellington Dec. ¶ 51; Exh. 61,   Wayne at pp. 21, 22) There is no evidence that any similarly situated white employee was treated more favorably than Wayne.

**(2). Carthen, McDonald and Mallory Pay Raise Claims.**

*Carthen's Pay Raise Claim.*

To the extent it ever existed, Carthen's pay raise claim was abandoned in that he failed to address defendant's motion for summary judgment concerning such claim.

*McDonald's Pay Raise Claim.[28]*

---

[27]   In deposition, Wayne made clear that he is well aware there was is a skill level higher than Mechanic II, despite his lawsuit claim to the contrary.  For example, he testified that, in May of 2004, he questioned Avionics Supervisor Hodges about promoting him from Mechanic II to Senior Mechanic.  (Exh. 61, Wayne at 180, 181)

[28]   McDonald did not allege this claim in his lawsuit complaint.

To the extent it ever existed, McDonald's pay raise claim was abandoned in that he failed to address defendant's motion for summary judgment concerning such claim.

*Mallory's Pay Raise Claim.*[29]

To the extent it ever existed, Mallory's pay raise claim was abandoned in that he failed to address defendant's motion for summary judgment concerning such claim.

**(3).  Mack's, Wayne's and Mallory's Promotional Skill-Level Progression Claims.**

*Mack's Promotion from Apprentice to Mechanic.*

Mack alleges that he was not promoted from Apprentice to Mechanic for 18 months, while similarly-situated white employees progressed from Apprentice to Mechanic after only six months of employment. (Exh. 32, Amended Complaint ¶ 57)   Under the established procedures in MAE's PPM, Apprentices are evaluated after 90 days, six months and  each six months thereafter until they are promoted to Mechanic.   To be promoted at the first six months evaluation, the Apprentice must have average monthly performance evaluations of at least   "5.0." The Apprentices' 6-month reviews are conducted by Leads, Supervisors and Managers, who may recommend promotion without the approval of MAE's Promotion Board.   Under the PPM, Apprentices should qualify for promotion to Mechanic within 18 months.  (Exh. 36, Tan Dec. ¶ 8; Exh. 22, PPM HR-307)

During Mack's 18 months as an Apprentice, he worked on different crews directed by various Leads in the Avionics Department under the overall supervision of Avionics Manager

---

[29]  Mallory did not allege this claim in his lawsuit complaint.

Phil Mixon.  (Exh. 36, Tan Dec. ¶ 14)   Mack always received satisfactory evaluations, and he has no complaints about the way any of his Leads evaluated his performance. (Exh. 58, Mack at 50, 87, 89)

At the time of his initial six month evaluation, Mack asked his Lead, David Nemecek (white), about progression to Mechanic.  (Exh. 58, Mack at 52)   According to Mack, Nemecek told him that Avionics Manager Phil Mixon normally did not promote employees from Apprentice to Mechanic after six months.     (Exh. 58, Mack at 52)   After his six month evaluation, Mack received a pay raise to $10.00 per hour but was not promoted to Mechanic at that time because his average monthly performance evaluation after six months was "4.9," not the score of "5.0" or above which is generally required for promotion to Mechanic at the first six month evaluation.    MAE gave Mack a pay raise to encourage him and scheduled him for another review in six months, February 2002. (Exh. 37, Wellington Dec. ¶ 61)

There is no evidence that Mack's Lead, David Nemecek, or Avionics Manager Phil Mixon denied Mack's progression to Mechanic after six months because of his race.   To the contrary, Mack testified that Nemechek treated him fairly.   Indeed, Nemececk had previously made a point of reassigning Mack to his crew because he believed that Mack was not receiving high enough performance evaluations on another crew.  (Exh. 58, Mack at 40-42)

To support his claim, Mack seeks to compare himself to three white employees who were promoted from Apprentice to Mechanic after six months: Matthew Wicks, Joshua Frye and Larry Givens.   However, the evidence establishes that each of these promotions was consistent with MAE's PPM guidelines.   At the time of his 6 month evaluation, Larry Givens

43

had an average monthly evaluation score of "6.0," or "above satisfactory" on MAE's scale, and he therefore was eligible for promotion to Mechanic after his first six months as a "high performer."[30]   (Exh. 37, Wellington Dec. ¶ 58)          Frye's average monthly evaluation score at six months was "5.0."    Additionally, Frye held an FAA A&P license, and had graduated from the Pittsburgh Institute of Aeronautics. (Exh. 37, Wellington Dec. ¶ 59)   Wicks' average monthly evaluation score at six months was "5.2."    He too had graduated from the Pittsburgh Institute of Aeronautics.  (Exh. 37, Wellington Dec. ¶ 60)

Around February 2002, Mack reminded Nemecek that his one year anniversary was approaching and that he was eligible for review for progression to Mechanic.  (Exh. 58, Mack at 60)   Nemecek told Mack that it would take a couple of weeks for Human Resources to send him the necessary paperwork.  Mack followed up with Nemechek in March and in April.    Each time, Nemecek allegedly told Mack that he did not have the paperwork but that he would check into it.   (Exh. 58, Mack at 62-64)

In August 2002, Mack  went to Human Resources to review his own monthly evaluations. (Exh. 58, Mack at 64)   He spoke with a woman he believes was HR Manager Wellington's secretary.    When they reviewed his personnel file, Mack discovered that the six month evaluation that should have been conducted in February 2002 was not in the file. Shortly thereafter, Mack received a promotion to Mechanic and a raise to $10.50 an hour.  (Exh. 58, Mack at 68).   After receiving the promotion, Mack returned to Human Resources to ask the

---

[30]   Although Mack *believes* that Larry Givens was promoted without completing and submitting the required on-the-job training sheets, he has proffered no evidence to support this supposition.    In contrast, MAE has established that Givens did in fact turn in OJT training sheets as required.  (Exh. 58, Mack at 154-155; Exh. 58, Wellington Dec.¶ 58 )

secretary if he would receive back pay from February (the date his evaluation should have been performed) to August 2002.  (Exh. 58, Mack at 69)  She later advised him that he would not receive back pay.  (Exh. 58, Mack at 69) HR Manager Wellington has no recollection of any of these events, except that he is certain that he did not talk to Mack himself.  (Exh. 37, Wellington Dec. ¶ 64)  While Mack complained to Leads and Supervisors that his promotion was slow, he never complained that he believed his race was a factor.[31]  (Exh. 58, Mack at 199)

At the time of the missed evaluation, Mack's Lead was Mark Charvat (white male), the Avionics Supervisor was David Nemecek (white male), and the Avionics Manager was Phil Mixon.  (Exh. 36, Tan Dec. ¶ 16)  There is no evidence that either Charvat, Nemecek or Mixon intentionally failed to perform the six-month evaluation because of Mack's race.  To the contrary, Mack testified that Charvat and Nemecek always treated him fairly.  (Exh. 58, Mack at 40-41)

Three black Avionics Apprentices started work within a few weeks of Mack: Jackie Ellis, LaKeesha Byrd and Curtis Phillips.  Each received timely evaluations at 90 days, the first six months and the second six months.  Each of these Apprentices were promoted to Mechanic in early 2002, based on timely second six-month evaluations and MAE's PPM guidelines for promotion.  (Exh. 36, Tan Dec. ¶¶ 21, 22, 23)

During the ongoing investigation of the EEOC charge and lawsuit, HR Manager

---

[31]  A year *later* when Mack asked his then-Lead Quinn Holbrook about the delay in his promotion from Apprentice to Mechanic, Holbrook replied "you're the wrong fucking color."  (Exh. 32, Amended Complaint ¶ 57)  Holbrook, however, was not Mack's Lead during the relevant time so he played no part in his evaluations or promotion from Apprentice to Mechanic.  (Exh. 36, Tan Dec.¶ 16) Consequently, Holbrook's alleged statement does not constitute evidence that the Leads responsible acted with discriminatory animus.

Wellington determined that Mack had been inadvertently skipped for the February 2002 evaluation. (Exh. 37, Wellington Dec. ¶ 62; Exh. 36, Tan Dec. ¶ 16) Based on Mack's monthly scores for the appropriate time frame, Wellington concluded that Mack should have been promoted to Mechanic in February 2002. Accordingly, MAE calculated the number of hours, including overtime, that Mack worked between February 2002 and the date of his promotion in August 2002, and paid him $723.96 in back pay. (Exh. 36, Tan Dec. ¶ 18) The skipped evaluation in 2002 did not affect Mack's timely promotion to Mechanic II.[32]

Wellington attended Mack's lawsuit deposition and heard Mack testify that the back pay he received did not fully compensate him because the Mechanics on his crew received pay raises in the Summer of 2002 (prior to his August 2002 promotion) while Apprentices did not. After the deposition, Wellington investigated again and determined that Mack was correct. A review showed that Mechanics with evaluations and attendance records similar to Mack's received raises between $.25 and $.35 an hour in April 2002. Accordingly, MAE calculated the number of hours Mack worked between April of 2002 and his promotion to Mechanic II in April of 2004 and paid him $.35 an hour, including overtime, for those hours, for a total payment of $1,782.90. [33] (Exh. 37, Wellington Dec. ¶ 63 ; Exh. 36, Tan Dec. ¶ 20) Wellington testified

---

[32] Promotion Boards meet quarterly. Under the PPM, Mack was required to serve 24 months as Mechanic I before being eligible for promotion to Mechanic II. If he had been promoted to Mechanic in February 2002, he would have served 24 months as a Mechanic in February 2004, and would have been eligible for promotion to Mechanic II when the next Promotion Board was held in April 2004. Mack was in fact promoted in April 2004. (Exh. 36, Tan Dec.¶19).

[33] When Mack became a Mechanic II on April 24, 2004 , he received a pay increase to from $10.50 per hour to $12.00 (the starting pay for a Mechanic II). Had he received the raise in April 2002, his rate of pay would have been $10.85 just prior to promotion. He still would have been increased to $12.00 at promotion to Mechanic II. Consequently, the detrimental effects of the skipped 2002 raise ended when he progressed to Mechanic II on April 23, 2004. (Exh. 36, Tan Dec. ¶ 20 )

46

that MAE's policy calls for mistakes to be corrected once they were discovered.   (Exh. 62, Wellington at 74-75)

***Wayne's Progression to Senior Mechanic.***

Wayne alleges that he was denied a skill level progression to Senior Mechanic after 42 months of employment, while similarly-situated white employees who had worked less than 42 months were promoted to Senior Mechanic.   (Exh 32, Amended Complaint ¶58).   His contentions are without merit.

After Wayne was hired in late December 2000, he received "satisfactory" and "above satisfactory" evaluations and he received four pay raises and a promotion from Mechanic I to Mechanic II.   Wayne does not complain about his performance evaluations or his pay raises within the pay range for the Mechanic II classification.   Indeed, his May 2002 pay raise to $13.50 placed Wayne at the top rate of the pay range for an Avionics Mechanic II.   (Exh. 37, Wellington Dec. ¶ 52; Exh. 36, Tan Dec. ¶ 6)

Because Wayne's performance evaluations were not "5.8 or above," he was required to work 42 months as a Mechanic II before he was eligible for progression to Senior Mechanic. (Exh. 37, Wellington Dec. ¶ 53; Exh. 36, Tan Dec. ¶ 23; PPM HR-307)   In April 2004, after Wayne had worked as a Mechanic II for only 39 months, Lead Victor Ruiz (Hispanic) and Supervisor Lloyd Hodges (white) recommended him for promotion to Senior Mechanic, and Hodges provided a written recommendation to Avionics Department Manager Phil Mixon for an early promotion:

. . . I know that [Wayne] is short about 3 months from the required 42 [months for progression to Senior Mechanic], but he is retired from the Navy and an AE6. I feel that with his Navy background, he should be able to go ahead and promote him 3 months early. If we do get pay increases this year, and we do not promote Damon, he will not receive anything because he is topped out [*i.e.*, achieved the highest rate within the pay range] as a [Mechanic II]. I have reviewed his monthly evals and he has an average of 5.2 but he is improving and last month he received 6s across the board. I am asking that we go ahead and promote him to a Senior Avionics Mechanic.

(Exh. 37, Wellington Dec.¶ 54, 55 ; Exh. 27, Hodges e-mail)

According to Wayne, around this same time, he asked Supervisor Hodges when he would be promoted, and Hodges told him that he was not eligible for promotion to Senior Mechanic because he had not served 42 months as a Mechanic II. (Exh. 61, Wayne at 178, 180). At that point, Wayne decided he would quit because Hodges' remark indicated to Wayne that Hodges had been looking into Wayne's personnel file. "I went to Mr. Hodges . . . [a]nd he said, You don't have enough time in grade. So with him knowing I didn't have enough time, what were you looking at my record for? Are you trying to promote me or are you not. . . . The best thing for me to do is to go." (Exh. 61, Wayne at 180-81, 189) Wayne does not articulate any reason why Hodges should not have reviewed his file. Certainly, Hodges review of Wayne's personnel file was fully consistent with MAE's policies and procedures, particularly as it was done in order to recommend him for promotion three months early. (Exh. 37, Wellington Dec. ¶¶ 16 and 53; Exh. 61, Wayne at 180, 181)    When Wayne received written notice shortly thereafter that he had been promoted to Senior Mechanic and awarded a pay increase to $13.85, he inexplicably quit.

Wayne alleges that co-workers, Orlando Martinez (hispanic), David Williams (black),

48

John Schonfeld (white), Luvimar Tobias (asian), Joseph Heckler (white) and Donald "Marx" (white) progressed to Senior Mechanics in less than 42 months.   (Exh. 32, Amended Complaint, ¶ 58)    Wayne's comparison is not apt.   The 42 months guideline in the PPM applies to Mechanics seeking promotion from Mechanic II to Senior Mechanic if their average monthly performance evaluations are between "4.0" and "5.7."[34]    The guideline is not applicable to employees who are hired as  Senior Mechanics.   Like plaintiffs Jon George and Theodore Carthen, each of these alleged comparators came to MAE with substantial direct experience and training in the type of work MAE performs and was hired as a Senior Mechanic, subject to the new-hire 90-day performance evaluation to confirm that he was performing at the Senior Mechanic skill level.   Each, in fact, performed at that level and each was confirmed as Senior Mechanic after 90 days. (Exh. 36, Tan Dec. ¶ 27)    In sum, Martinez, Williams, Schonfeld, Tobias, Heckler and Marx are not relevant comparators for Wayne, who was hired as a Mechanic II based on his own qualifications.

### *Mallory's Progression to Mechanic II.*

Mallory worked as a Technician in Facilities from the date he was hired until the February 2001, when he requested and was granted a transfer to the Interiors Department as a Mechanic I.  (Exh. 59, Mallory at 49)    Mallory worked in Interiors until May 2003, when he once again requested and was granted a transfer back to Facilities as a Technician.  (Exh. 36, Tan Dec.¶ 9)

---

[34]   A Mechanic II is eligible for progression to Senior Mechanic after 30 months if his or her average monthly performance evaluations are "5.8 or above."  (Exh. 34, Rivera Dec. ¶¶  5 and 6)

In deposition, Mallory complained that he was denied promotion from Mechanic I to Mechanic II because of his race during the time he worked in the Interiors Department between February 2001 and May 2003. Mallory did not identify any "similarly situated" white Mechanics who progressed more quickly than he, but speculated "that there are some [white Mechanics] that started after me that probably got promotions or raises a lot faster than I did." (Exh. 59, Mallory at 194-195)

During his two years as a Mechanic in Interiors, Mallory regularly received "above satisfactory" monthly performance evaluations, although his evaluations throughout his time in Interiors often noted that he needed to improve his attendance. (Exh. 36, Tan Dec. ¶ 28) Indeed, from January until mid-May 2003, Mallory was tardy at least 50 times. He was counseled by Interiors Lead Tommy Buckmaster and given a "3" or "below satisfactory" evaluation on "attitude," the category that takes into account absenteeism and tardiness. Shortly after he was counseled in May 2003, Mallory requested and was granted a transfer back to facilities as a Technician. (Exh. 39, Buckmaster Dec.; Exh. 41, Czarnecki Dec.; Exh. 36,Tan Dec. ¶ 9; Exh. 59, Mallory at 148-152)[35]

Mallory complained that he should have been promoted from Mechanic I to Mechanic II during the two years he worked in the Interiors Department. Under MAE's procedures in the PPM, a Mechanic I is eligible for promotion to Mechanic II after 24 months if he achieves an

---

[35] Mallory *believes* that he was given a lower monthly performance evaluation in May 2003 and cited for excessive tardiness and absenteeism because of his race. He has set forth no facts and proffered no evidence to support his belief. (Exh. 59, Mallory at 85-87) Lead Buckmaster and Supervisor Czarnecki gave a low monthly performance evaluation to Gaston Irby (white) at around the same time as Mallory. (Exh. 39, Buckmaster Dec.; Exh. 41, Czarnecki Dec.) Mallory and Irby received the "3" rating for the same reason, excessive tardiness and absence.

average monthly evaluation of between "4.0" and "5.7" and if his attendance merits the promotion.[36]   Although Mallory's overall evaluations averaged above "4.0," he had significant attendance problems (primarily tardiness) evidenced by a "3" on his performance evaluation and a counseling on attendance.   He was not eligible for promotion for that reason.   (Exh. 37, Wellington Dec. ¶ 71; Exh. 41, Czarnecki Dec.; Exh. 39, Buckmaster Dec.)   There is no evidence that any similarly situated white employee was treated more favorably.

Mallory also complains that his supervisors in the Interiors Department lost his on-the-job training sheets on purpose.   He speculates that this happened because he is black and that it delayed his promotion to Mechanic II.   However, as stated above, Mallory was not eligible under MAE's written guidelines for promotion to Mechanic II until the end of the time he worked in Interiors.   Just as he became eligible, he requested a transfer to another department.   Mallory speculates that MAE treated white employees better, but offers no admissible evidence that anyone – black or white – was treated differently than he was.

**(4)      Carthen and George Denial of Promotion Claims**

***Carthen's Denial of Promotion to Lead.***

To the extent Carthen ever alleged that he was discriminatorily denied   promotion to a Lead position that was filled by   Kevin McBride (white) in 2003 or the Lead opening in the Composites Shop which was posted in August 2004, he has now abandoned that claim by failing

---

[36]   A Mechanic I can be promoted to Mechanic II after 18 months if his average monthly evaluations are "5.8 or above" and he maintains acceptable attendance.   Neither Mallory's evaluations nor his attendance met that standard.   (Exh. 36, Tan Dec.¶ 28; Exh. 6, Mallory's 2003 evaluation, MAE 511 and 511A))

to response to MAE's motion for summary judgment concerning same.

***George's Denial of Promotion Claim.***

George claims that he was discriminatorily denied a promotion to Project Manager in 2003. (Exh. 57 , George at 163-164)

Shortly after George was appointed to Acting APG Lead for the third time in May 2003, MAE posted openings for APG Leads, Sheetmetal Leads, and Project Managers.   (Exh. 35, Rivera Dec. ¶ 9; Exh. 57, George at 150)     According to George, he applied for the posted openings for APG Lead and Project Manager.  (Exh. 57, George at 160-163)  Human Resources received and processed George's application for the Lead position under MAE's established promotion procedures. (Exh. 35, Rivera  Dec. ¶ 11)  In November 2003, George was promoted to APG Lead.  (Exh. 57 ,George at 53; Exh. 35, Rivera Dec. ¶ 11)[37]     On the other hand, MAE did not consider George for the Project Manager's position because MAE did not receive (or lost) George's application.  (Exh. 57, George at 163-64; Exh. 35, Rivera Dec. ¶ 13) MAE has no record of George applying for the Project Manager position.  (Exh. 35,Rivera Dec. ¶¶ 10-13)

Under the PPM, applications for posted job openings are submitted to Human Resources.   Once submitted, the applications are placed in a promotion book along with relevant performance and employment data for each applicant.   The book is then forwarded to the appropriate Department Manager to select a candidate.   The Human Resource representative

---

[37]  Because he was eligible for overtime as an APG Lead, while a Project Manager is an exempt salaried position, George actually earned more during 2004 than he would have earned as a Project Manager.

who maintains these records, and who knows George personally, has no recollection of having received an application from George for the Project Manager position.   She has searched all the promotion books for May 2003 to see if the application was misfiled but has not found it. (Exh. 35, Rivera Dec. ¶¶ 10-13)   There is no evidence to suggest that MAE intentionally misplaced or discarded George's application for the Project Manager position because of his race.

**(5)   McDonald's Discipline Claim**

McDonald alleges that MAE discriminatorily disciplined him for his role in an incident that resulted in "substantial damage" to an aircraft.  (Exh. 32, Amended Complaint ¶ 66)

On January 4, 2003, an aircraft was damaged while being moved from Hangar 8 to Hangar 5.   McDonald assisted in moving the airplane and was suspended for three days without pay as a result of the accident.   (Exh. 60, McDonald at 146 151, 152)   James Winkler (white) was also suspended for 3 days without pay for the same incident.   MAE conducted an investigation of the incident involving damage to the aircraft and concluded that McDonald and James Winkler (white) were partially at fault.   Both were suspended for that reason.   (Exh. 54, Webb Dec.)[38]   McDonald never asserted a complaint of discriminatory discipline under MAE's *EEO Policy*.   (Exh 60, McDonald at 166).   He has no evidence to support his belief that his race played any part in his disciplinary suspension.

_____

[38]  MAE's investigation could not conclude that the white employees identified in McDonald's lawsuit complaint (Kevin Clark and Charlotte Farmer) were at fault, and they were not disciplined for that reason.  For some reason, McDonald did not identify Winkler, who received the same discipline as McDonald as a comparator.  (Exh. 54, Webb Dec.; Amended Complaint ¶ 66).

McDonald also complains that he was issued a disciplinary report for insubordination that he believed to be   unjustified.   McDonald's prompt complaint resulted in a thorough investigation by MAE's EEO Committee, a finding that the discipline was unfair, and the immediate removal of the disciplinary report from McDonald's file.   McDonald received written notification that the discipline was inappropriate and had been removed from his file. (Exh. 60, McDonald at 191-192; Exh. 37, Wellington Dec. ¶ 77) The Lead who wrote the unfair discipline was terminated, albeit for a different reason.

In his opposition to MAE's summary judgment motion, McDanald complains about a third incident which he neither raised in his EEOC charge or included previously in his complaint.   According to McDonald, at some unspecified time, MAE wrote a "rejection report" for work performed by McDonald and co-employee Farmer (white).   Even assuming that MAE wrote the rejection report on the wrong employee, there is no evidence it did so because of race or that McDonald suffered any tangible employment action as a result of this "rejection report." Nor is there any evidence to refute MAE's contention that the report was not placed in McDonald's personnel file.

**(6)    George's and Wayne's Demotion Claims.**

*George's Demotion from Acting Lead*

George complains that he was discriminatorily removed from an "Acting Lead" position in November 2002 by Program Manager Ben Morris (white).   George claims that six other Acting Leads or Leads – Elliot Lambert (white male), Jeremy Lewis (white male), Alan

Campbell (white male), Allen Parry (white male), Jeff Schnoes (white male) and Chris LNU (white male) – kept their jobs under similar circumstances.

At the time George was relieved of his "Acting" Lead duties, he complained to Manager of Administration George Bell that he thought his demotion was unfair; he did not complain that he believed his race played any part in the decision and he did not identify  similarly situated white employees he believed were treated more favorably.  (Exh. 57, George at 75)   Bell asked George to talk to Vice President of Operations Mike Anderson (white male),  who scheduled a meeting with George and Program Manager Ben Morris.  (Exh. 57, George at 75).   At the meeting, Morris gave George several reasons for his decision.  (Exh. 57, George at 75, 77, 81, 82).  George disagreed with Morris' reasons and said so.  (Exh. 57, George at 75, 77) Morris did not change his decision. (*Id.*)

In August 2002, newly promoted FedEx DC-10 Program Manager Ben Morris assembled a new staff for the FedEx Program.  (Exh. 52, Morris Dec. ¶ 7)  Morris brought in four new people for the Program, including Project Manager Bob Holloway (white), who previously worked with him on the FedEx 727 Program, Project Manager Don Pearce (white), Lead Jason Dixon (white), and Relief Lead Calvin Knight (black ).    Morris left the existing supervisory team on FedEx DC-10 aircraft in place for evaluation, including four Project Managers - - Alvin Bass (black), Bill Barnes (white ), John Couture (white) and Pat Vowell (white) - - and three Acting Leads - - Pete Lenoire (white), Elliot Lambert (white), and Jon George (black).  (Exh. 52, Morris Dec. ¶ 7)

Morris observed these employees, including George, from August through mid-

November 2002.    According to Morris, George did not spend enough time around the crew when the Mechanics were working on the   aircraft.   Also George apparently had developed a "clique" of workers in his crew with whom he spent most of his time, rather than making himself equally available to all crew members. (Exh. 52, Morris Dec. ¶ 9)   Morris also was dissatisfied with   George's crew's work pace.   During the same time frame, George's crew members were involved in a number of accidents, which did not reflect well on George's direction of   the crew.   Morris met with George privately and explained, in substance, that George did  not supervise his crew closely enough and that Morris had decided to replace him as Acting Lead based on Morris' evaluation that substituting a new Acting Lead was the best decision for the FedEx DC-10 Program.  (Exh. 52, Morris Dec. ¶ 10)

George   identifies   several   white   employees   as   comparators:   Elliot   Lambert,   Jeremy Lewis, Alan Campbell, and Alan Parry.[39]   George contends that each of these Leads or Acting Leads were involved in accidents, but were not demoted.   While some of these employees were involved in accidents involving damage to an aircraft, none was under Morris' supervision at the time of the incidents in question.[40]   Therefore, they are not similarly situated to George.

George also compares himself to Jeff Schnoes (white), who was a permanent Lead under Program Manager Morris' supervision in 2004 when his crew damaged an aircraft, approximately 1-½ years after George was relieved of his Acting Lead job.   Schnoes was

---

[39] MAE has not been able to identify the person George names as "Chris."

[40]  Elliott Lambert worked under Morris after August 2002, but at the time of his supposed accident he  worked under a different manager.  (Exh. 52, Morris Dec. ¶¶ 13 and 14)

determined to be at fault and was disciplined but not demoted.  Morris considered the discipline appropriate for a <u>single accident</u>, considering Schnoes overall performance as Lead.  (Exh. 52, Morris Dec. ¶ 10)   In contract, George was removed from his Acting Lead position based on a course of conduct occurring over several months.   Given these differences, George and Schnoes are not similarly situated.

MAE's decision to relieve an Acting Lead is not comparable to a one-time disciplinary decision involving a permanent Lead.  It is fairly common at MAE for employees to hold Acting Lead positions temporarily, sometimes more than once, before finally moving into a permanent Lead position.  (Exh. 37, Wellington Dec.¶ 13)   For example, Tommy Buckmaster (white) was demoted from his Acting Lead position by Program Manager Willie Bailey (black) at a time when Buckmaster was distracted by personal problems.  Like George, Buckmaster thought his demotion was unfair because he was not given warning or a chance to improve.   Like George, Buckmaster was later promoted to a regular Lead position.  (Exh. 37, Wellington Dec. ¶ 13; Exh. 39, Buckmaster Dec. )   George became a permanent APG Lead in November 2003, just one year after this demotion.  (Exh. 36, Tan Dec. ¶ 9)

***Wayne's Demotion from "Acting" Lead.***

Wayne apparently does not oppose MAE's summary judgment regarding his claim of demotion from "Acting" Lead, or has abandoned the claim, inasmuch as he has failed to respond in opposition to same.

**(7)      Wayne's Job Assignments and Required Time Off.**

Wayne complains that he was asked to perform work that, though necessary, was below his skill level.   For example, he complains that he was assigned to wipe corrosion off aircraft parts, a job he knew needed to be done.   (Exh. 61, Wayne at 302-304).    On the other hand, Wayne also complained when he was assigned to do highly skilled, responsible jobs that could enhance his opportunities for promotion.    (Exh. 61, Wayne at 305).    While Wayne performed these tasks satisfactorily, he suspected that he was only being assigned the work to "set [him] up for failure." (Exh. 61, Wayne at 306-307)   Wayne does not identify any adverse employment action he suffered as a result of these job assignments.

Wayne also complains that he and other black employees were required to take "credit time" or "time off" from Lead Jimmy Prestage's (black) crew when work was slow during September and October 2001, while white employees were assigned to perform jobs elsewhere. According to Wayne, the only alternate job assignments available were on a crew headed by Robert Craft (white), a Lead who had called him "boy" in the past.   (Exh. 61, Wayne at 102) Wayne chose not to work under Craft.  *(Id.)*

There are times when the reduced volume of work dictates that MAE requires employees to take "time off" or "credit time" instead of working.   "Time off" means that employees and contract workers are sent home without pay.    "Credit time" is part of an overtime  prepayment plan approved by the Department of Labor, which allows MAE to pay direct employees their regular wages for forty hours each week even when the employee does not work forty hours

58

because of a reduced work load; *i.e.*, the direct employees are paid for hours they do not work.[41]

MAE's general practice is for contract workers to be required to take time off before direct employees unless direct employees volunteer. (Exh. 44, Gennero Dec. Page 1)    After Wayne included the claim in his lawsuit complaint, MAE reviewed its "credit time" and "time off" records in the Avionics Department where Wayne worked for September and October 2001.   During that time, 27 black Mechanics, 88 white Mechanics, and 10 Mechanics of other races worked in Avionics.   Of those, 12 black Mechanics took "CR" or "TO", 26 white Mechanics did so, and 4 Mechanics of other races did so. (Exh. 37, Wellington Dec. ¶¶ 74 and 75; Exh. 36 Tan Dec. ¶ 25)   There is no statistical basis for concluding that black Mechanics were required to take "CR" or "TO" more often than white Mechanics or Mechanics of other races.   Wayne has no other evidence to suggest that race was a factor.

## CONCLUSIONS OF LAW

### Summary Judgment Standard

Neither the plaintiffs, nor this Court, can take issue with MAE's delineation of the standard applicable to the present motion.   Consequently, the Court adopts same as proper in all respects.[42]

---

[41]  The employees "pay back" the "credit time" loan when they perform overtime work in subsequent work weeks.   (Exh. 37, Wellington Dec.¶ 74 ).

[42]  As Stated By MAE in its motion:

> MAE is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and . . . affidavits . . . show that there is no *genuine* issue as to any *material* fact and that [MAE is] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added).   Under Rule 56(c):
>
> A factual dispute is "genuine" if the evidence is such that a reasonable jury could

**Racially Hostile Work Environment Claim**

In *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002), the Eleventh

Circuit set forth the elements necessary to support a hostile environment claim:

> Title VII of the Civil Rights Act of 1964 prohibits employers from
> discriminating "against any individual with respect to his compensation,
> terms, conditions, or privileges of employment, because of such
> individual's race, color, religion, sex, or national origin." 42 U.S.C. §
> 2000e- 2(a)(1). A hostile work environment claim under Title VII is
> established upon proof that "the workplace is ***permeated with***
> ***discriminatory intimidation, ridicule, and insult, that is sufficiently***
> ***severe or pervasive to alter the conditions of the victim's employment***
> ***and create an abusive working environment***." *Harris v. Forklift*
> *Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295
> (1993). This court has repeatedly instructed that a plaintiff wishing to
> establish a hostile work environment claim show: (1) that he belongs to
> a protected group; (2) that he has been subject to unwelcome harassment;

---

return a verdict for the non-moving party.  A fact is "material" if it might affect the
outcome of the suit under governing substantive law.

*Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for [the plaintiffs], there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the plaintiffs fail to produce sufficient evidence to raise a genuine issue of material fact on the existence of an essential element of their claims.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986*); Manor Healthcare Corp. V. Lomelo*, 929 F.2d 633, 636 (11th Cir. 1991).

In considering MAE's motion for summary judgment, the Court views the facts presented, together with all reasonable inferences arising from the facts, in the light most favorable to the plaintiffs. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004).  As the moving party, MAE has the initial burden of showing the absence of a genuine issue of material fact.  *Id.*  Once MAE makes that showing, the burden shifts to the plaintiffs to "come forward with *specific* facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (1986).  Confronted with a properly supported motion for summary judgment, the plaintiffs must adduce admissible evidence which creates a material factual dispute.  *Clarke v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Plaintiffs cannot meet this burden with mere belief, conjecture or speculation that they were subjected to unlawful harassment or discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987).  Plaintiffs must do more than "simply show there is some metaphysical doubt as to the material facts."  *Anderson*, 477 U.S. at 251-52.  They must produce evidence.  *Id.*

(3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the *harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment*; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

277 F.3d at 1275 (emphasis added).  *See also,* Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir.1999) (applying these factors in the context of a hostile environment sexual harassment claim).

The fourth element, whether the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is the element that tests the legitimacy of most harassment claims and is therefore regarded as crucial. *See, Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *citing, Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).   The " 'mere utterance of an ... epithet which engenders offensive feelings in an employee' ... does not sufficiently affect the conditions of employment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993), *quoting, Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).   Only when the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the [employee's] employment and create an abusive working environment," is the law violated. *Harris*, 510 U.S. at 21,  *quoting, Meritor*, 477 U.S. at 65-67.

Consequently, the employee must make both a subjective and an objective showing in order to establish that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment.    *Mendoza*, 195 F.3d at 1246. The employee

must establish not only that he subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *Gupta*, 212 F.3d at 583, *citing*, *Mendoza*, 195 F.3d at 1246. The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all of the circumstances. *Mendoza*, 195 F.3d at 1246, *citing*, *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 81 (1998).

In determining whether the harassment objectively altered an employee's terms and conditions of employment, the following four factors should be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.   Mendoza*, 195 F.3d at 1246, *citing*, *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997). The conduct must be examined in context, not as isolated acts, and the severity and pervasiveness of the conduct it must be judged under the totality of the circumstances. *Allen*, 121 F.3d at 647. *See also*, *Harris*, 510 U.S. at 23; *Henson*, 682 F.2d at 904; *Faragher*, 524 U.S. at 787-88.

Several recent cases illustrate the Supreme Court's "demanding" standard for judging a hostile working environment. Summary judgment was affirmed for an employer in a racial harassment case because the plaintiff failed to show the use of racial slurs was "severe or pervasive." *Shields v. Federal Express Corp.*, 120 Fed.Appx. 956, 961 (4th Cir. 2005) (the question is whether the use of racial epithets and abusive language so pervaded the work environment . . . that it was essentially transformed into an atmosphere tinged with racial

62

hostility and altered the conditions of [the plaintiff's] employment.   As a general rule, the incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.); *See also Vazquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003) (Affirming summary judgment on ethnic harassment claim on the ground that references to plaintiff's national origin and alleged racial comments reported to the plaintiff by others were not sufficiently severe or pervasive to support a hostile environment claim.); *Hounton v. Gallup Independent Co.*, 113 Fed.Appx. 329, 332 (10th Cir. 2004) (Affirming summary judgment because of lack of evidence that the entire environment was racially hostile.); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) (Affirming summary judgment for employer on racial harassment claim because the   conduct was not sufficiently severe or pervasive.); *Bass v. E.I. Dupont De Nemours & Co.*, 324 F.3d 761 (4th Cir. 2003) (same), *cert. denied* 540 U.S. 940 (2003); *Mosley v. Marion County, Miss.*, 111 Fed.Appx. 726, 728 (5th Cir. 2004) (same).

Where, as here, plaintiffs rely in whole or in part on second-hand reports of racially-motivated incidents directed towards other employees (*i.e.*, incidents *not* involving the plaintiffs) they face stringent standards.   *Smith v. Northeastern Illinois University,* 388 F.3d 559, 567 (7th Cir. 2004).   Initially, plaintiffs must establish any such incidents by admissible evidence: Inadmissible hearsay may not be considered on summary judgment.   *Macuba v. Dekorer,* 193 F.3d 1316 (11th Cir.  1999).   Even where second-hand reports are supported by admissible evidence, the Court weighs such evidence carefully.   *Id.*   While second-hand reports may be relevant in determining the existence of a hostile work environment, the "impact of

'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Id. See also Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756 (8th Cir. 2004) (Affirming summary judgment where racial slurs were directed at third parties, not plaintiff, and many of the comments were merely overheard by plaintiff.); *Gleason v. Mesirow Fin. Inc.,* 118 F.3d 1134, 1144 (7th Cir. 1997) (same); *Turner v. Honeywell,* 54 Fed.Appx. 236, 239, (7th Cir. 2002) (Affirming summary judgment for employer in racial harassment case: "Given the totality of the circumstances, second-hand reports that racial slurs were overheard in the workplace are insufficient in this case to support a harassment claim.").[43]

Whether MAE is liable for alleged racial harassment depends, in part, on whether the harassment was committed by a supervisor with authority over the plaintiff(s) or by non-supervisory co-worker(s).   MAE is only responsible for harassment by co-workers if the plaintiffs establish that MAE had reason to know about the harassment and negligently failed to respond appropriately.    On the other hand, MAE could be held responsible for proven harassment by a supervisor that it knew nothing about, unless MAE establishes the two-part affirmative defense outlined in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).   Under the so-called *Faragher* defense, MAE is not liable for harassment by supervisors *if* the evidence shows that MAE   "exercised reasonable care to prevent and correct promptly any

---

[43]   While the plaintiffs may rely on reports of harassment directed at other employees to support their hostile environment claim, they must produce *admissible* evidence of the alleged incidents.   The plaintiffs may not rely on hearsay reports uncorroborated by admissible evidence based on the first-hand knowledge of those involved. *Macuba v. Deborer*, 193 F.3d 1316 (11th Cir. 1999; *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) (citing cases from six Circuits): *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir.1999); *Pritchard v. Southern Co. Servs*., 92 F.3d 1130, 1135 (11th Cir.1996); *McMillian v. Johnson*, 88 F.3d 1573, 1584- 85 (11th Cir.1996).

[unlawful] harassing behavior," *and* the plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the [employer]." *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 510 (11th Cir. 2000) (citing *Faragher*, 524 U.S. at 807). Evidence on those points is also admissible to prove that MAE was not negligent in discovery or response to harassment. *Id.*

MAE is only liable for a co-worker's harassment if it "knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." *Johnson*, 234 F.3d at 510, *citing*, *Faragher*, 524 U.S. at 807. Actual notice can be established by proof that management knew of the harassment, whereas constructive notice can be shown where the harassment was so severe and pervasive that management should have known of it. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278-79 (11th Cir. 2002). Where, as here, plaintiffs principally claim that non-supervisory co-workers were responsible for creating a hostile work environment, they must show that MAE has been negligent either in discovering or remedying harassment. *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003); *See also Williams v. Waste Management of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004); *Ford v. West*, 222 F.3d 767 (10th Cir. 2000) (Affirming summary judgment in co-worker racial harassment case where plaintiff failed to establish the employer was negligent: "Only when the acts of harassment are 'so egregious, numerous and concentrated as to add up to a campaign of harassment' will the employer be liable for failure to discover the harassment.").

Consequently, MAE can establish that it was not at fault by showing that it took reasonable steps to discover and stop harassment, including creating and enforcing an effective

EEO Policy and complaint procedure.   *Farley v. Am. Cast Iron Pipe Co.,* 115 F.3d 1548, 1554 (11th Cir. 1997)(When an employer has "promulgated an effective and comprehensive" anti-harassment policy that is "aggressively and thoroughly disseminated"  to its employees, an employee's failure to utilize the policy's grievance process will prevent constructive knowledge of such harassment from adhering to the employer.).    MAE's implementation of a harassment policy and complaint procedure sufficient to pass muster under *Faragher* is strong evidence that MAE was *not* negligent in its efforts to discover and prevent co-worker harassment.   *Id.; Williams v. Waste Management of Ill.*, 361 F.3d 1021 (7th Cir. 2004) (The employer was *not* negligent in its attempt to discover and prevent harassment in the workplace because the employer admittedly had a policy prohibiting harassment and the policy included a complaint procedure for employees to assert harassment complaints.).

MAE can be liable for proven racial harassment committed by its supervisors unless MAE establishes both that it exercised reasonable care "to prevent and correct promptly" any harassing behavior *and* that the plaintiff(s) unreasonably failed to take advantage of these preventative or corrective opportunities.   *Johnson v. Booker T. Washington Broadcasting Services, Inc.*, 234 F.3d 501 (11th Cir. 2000).   With regard to the first element, MAE satisfied its obligation to exercise reasonable care to prevent unlawful harassment by implementing a comprehensive and widely distributed policy that prohibits all forms of unlawful harassment and that is "designed to encourage victims of harassment to come forward [without requiring] the victim to complain first to the offending supervisor." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290 (11th Cir. 2000), *cert. denied*. 531U.S. 926 (2000).   Such a policy fulfills

66

MAE's obligation, *absent* evidence that MAE administered it "in bad faith" or that the policy was otherwise "defective or dysfunctional." *Madray,* 208 F.3d at 1299.    MAE's policy is not ineffective merely because harassment occurs.

> [A]nti-harassment efforts need not succeed in order to be reasonable. [Plaintiff] suggests no defect in the policy itself or in its implementation that could support a claim that [the employer] failed in its duty to prevent harassment . . . *It is not enough for the plaintiff to show that the harassment was repetitive; it must also have been obvious, such that there is a clear implication that the company either did know of the harassment or only failed to know because it was neglecting its duty to properly monitor its employees.*

*Episcopo v. General Motors,* 128 Fed.Appx. 519, 523 (7th Cir. 2005). (emphasis added).   *See also Madray, supra.*

With regard to the second element, proof that an employee failed to use MAE's specific complaint procedure  for reporting harassment satisfies MAE's burden of showing that the employee "unreasonably failed to take advantage of [the] preventative or corrective opportunities provided by [the employer] to avoid the harm. *Walton v. Johnson & Johnson Services,* 347 F.3d 1272, 1286 (11th Cir. 2003) (Granting summary judgment in favor of the employer despite egregious supervisory harassment because the victim failed to utilize the employer's established complaint procedure.), *cert. denied* 124 S. Ct. 1714 (2004); *Episcopo,* 2005 WL 352432 at *10-12 (7th Cir. 2005).[44]

It is undisputed that the plaintiffs belong to a protected group.   All plaintiffs claim that

---

[44]   If the employee utilizes the employer's complaint procedure to report the harassment, or if the employer otherwise has *actual* knowledge of the harassment, the employer is required to investigate and, if appropriate, to take prompt and effective remedial action.  If the employer does so, the employer is not liable for the harassment.  *Ford v. West,* 222 F.3d 767 (10th Cir. 2000).

they were "subjected to a racially hostile work environment at MAE" as a result of alleged racial "slurs" and "symbols" occurring over a period of several years.   (Amended Complaint ¶¶ 18-55). In viewing the evidence in a light most favorable to the plaintiffs, the Court will accept that most of the alleged "slurs" and "symbols" were race-based and unwelcome.[45] The crucial question before the Court is whether the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment and create an abusive working environment.

Applying these standards to the plaintiffs' hostile environment claims, the Court concludes that the plaintiffs have failed to produce sufficient evidence to show that the racial "slurs" and "symbols" were sufficiently "severe or pervasive" to alter the terms and conditions of any plaintiff's employment and create an "abusive working environment."   While the plaintiffs may have subjectively perceived their working environment to be hostile, the Court concludes that the conduct is not severe or pervasive enough to create an objectively hostile or abusive working environment – an environment that a reasonable person would find hostile or abusive." *Oncale v. Sundowner Offshore Servs.,* 118 S. Ct. 998, 1003 (1998).

---

[45]   The plaintiffs complain at some length about the display of the Confederate flag on small decals, on toolboxes and automobile bumpers, Confederate flags on clothing or caps and Confederate flag tattoos.   Plaintiffs do not cite a single incident in which the flag was displayed with other symbols or words that would objectively show that it was *intended* to offend or intimidate black employees.   MAE has taken steps to minimize, if not eliminate, the display of Confederate flag paraphernalia and has banned any display that could be construed as offensive or intimidating.   The Court is sensitive to the feelings of many African-Americans who find the flag subjectively offensive.   However, the Court cannot conclude that the mere display of small Confederate flags in the manner described by the plaintiffs *objectively* would contribute to a hostile environment. *Mosley v. Bojangles Restaurant, Inc.*, 2004 WL 727033 (M.D. N.C. 2004) (Granting summary judgment for employer on the ground that the employer's apparent condoning of the sale of Confederate flag memorabilia on the employer's premises did not meet the objective standard for establishing intolerable work conditions.); *Gonzalez v. Fla. Dept. of Highway Safety,* 237 F. Supp. 2d 1338 (So. D. Fla. 2002) ("The Confederate flag [is] not necessarily even related to race.") *aff'd* 2002 WL 1676549 (11th Cir. 2002) (table); *Flenaugh v. Airborne Express, Inc.*, 2004 WL 407009 (N.D. Ill. 2004) (A manager's display of a Confederate flag tattoo was insufficient to create a hostile work environment.).   Nevertheless, the Court has considered these incidents with regard to   whether the plaintiffs subjectively perceived the workplace to be hostile.

Many of the incidents described by the plaintiffs were never reported to MAE and there is no evidence that MAE otherwise had actual knowledge of the incident(s).  Moreover, to the extent these unreported episodes involved alleged harassment by co-workers, there is no evidence that MAE had constructive knowledge of the alleged harassment.  Indeed, MAE's indisputably comprehensive *EEO Policy* virtually forecloses any argument that MAE had constructive knowledge of unreported incidents of co-worker harassment.  *Farley v. Am. Cast Iron Pipe Co.,* 115 F.3d 1548, 1553-4 (11th Cir. 1997).

To the extent one or more plaintiff reported alleged harassment to Leads, Supervisors or Managers, but failed to report the alleged harassment under the "complaint procedure" in MAE's *EEO Policy*, the alleged reports were insufficient to put MAE on notice of the alleged harassment.  The "complaint procedure" under MAE's *EEO Policy* specifically provides that employees **"must"** report any incident of harassment directly to the Manager of Administration or the Manager or Human Resources.  The Policy emphasizes that "it is essential that [the employee] promptly notify" those officials and that "**reporting it to your manager or supervisor is *not* sufficient**."  All plaintiffs received the *EEO Policy* and complaint procedure several times during his employment, including at orientation, later in the mail, on the communication boards, in the *Handbook* and through updates.  Under these circumstances, reports to lower-level supervisors or managers or Lead Mechanics is not sufficient notice to MAE and does not support the conclusion that MAE was on "constructive" notice of the alleged harassment.  *Dudley v. Wal Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999) (Actual

notice of racial discrimination to two Wal Mart Stores managers could not serve as notice to the corporation because the managers were not sufficiently high up the corporate ladder); *Farley v. Am. Cast Iron Pipe Co.,* 115 F.3d 1548, 1554 (11th Cir. 1997) (Employees' failure to utilize the employer's effective and comprehensive anti-harassment policy that was aggressively and thoroughly disseminated will prevent constructive knowledge of such harassment from adhering to the employer.).[46]

MAE's *EEO Policy* and "complaint procedure" is indisputably sufficient to satisfy the Company's obligation to exercise reasonable care to prevent unlawful harassment. The *EEO Policy* is comprehensive and widely distributed to all employees. It prohibits all forms of unlawful harassment and the policy is "designed to encourage victims of harassment to come forward [without requiring] the victim to complain first to the offending supervisor." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1299 (11th Cir. 2001), *cert denied* 531 U.S. 926 (2001). Plaintiffs cite two instances in which alleged harassment was reported to the Manager of Administration with no response: First, when Manager Bell replied in writing to Clarence McDonald's racism complaint but failed to respond to McDonald's verbal follow-up; second,

---

[46] In view of the number of employees and contract workers assigned at any one time to different departments and performing in a number of crews, each subject to its own chain of supervision, MAE was certainly entitled to require that, pursuant to its *EEO Policy*, any incident of harassment must be reported to the Manager of Administration or the Manager of Human Resources, rather than any other supervisor or manager in the company. It is specious for Plaintiffs to contend that MAE's policy is unreasonable on its face because it requires employees to report alleged harassment "to the director of human resources, or some such other high officer in the company" and simultaneously attempt to hold the company strictly liable when plaintiffs fail to comply with the policy despite ample evidence that MAE's response to each properly presented report was both prompt and effective. (Plaintiffs' Opposition Brief at 57-58).

when Bell allegedly failed to respond to Wayne's report of a figurine and noose.[47]   MAE disputes that these incidents were reported.   For the purpose of summary judgment, the court credits the plaintiffs' testimony, but concludes that these isolated episodes were insufficient to show that MAE administered the policy "in bad faith" or that the policy was otherwise "defective or dysfunctional."   *Madray*, 208 F.3d at 1299.   This is particularly true when MAE has adduced evidence that its *EEO Policy* and complaint procedure has worked effectively for fifteen years.   (Exh.   33, Bell Dec. ¶15).   The Court has fully considered these incidents in evaluating whether the harassment was sufficiently severe or pervasive to create a hostile work environment.

Except in those two instances, when alleged harassment was reported to MAE under the complaint procedure, MAE indisputably took prompt and effective remedial action.   Indeed, the most egregious incident cited by the plaintiffs, the March 1, 2002 "hangman's noose," confirmed MAE's commitment to the *EEO Policy* and to prompt and effective remedial action for a violation – MAE promptly investigated, diligently sought out the perpetrators, discharged the two employees involved once they were identified, defended their unemployment

---

[47]   Plaintiffs cite a third instance when McDonald made a written complaint that Administration Manager Bell failed to answer.   The undisputed evidence establishes that Bell investigated the complaint and found no EEO violation.   (Exh. 33, Bell Dec. ¶24).   His inadvertent failure to respond to McDonald at the conclusion of the investigation does not render MAE's *EEO Policy* ineffective.   This is not a case in which the employer did nothing.   *Cf. Haugerud v. Amery Sch. Dist.*, 259 F.3d 678 (7th Cir. 2001) (vacating summary judgment on harassment claim because of employer's failure to act when complaint received).   To show MAE's policy is ineffective, the plaintiff must prove that MAE officials *ignored* complaints or failed to take corrective action  when appropriate.   *See Breeding v. Cendant Corp.*, 2003 U.S. Dist. LEXIS 6558, 2003 WL 1907971 (S.D. N.Y. 2003).   The uncontroverted evidence establishes that MAE did act: It investigated complaints thoroughly (including this one) and took effective remedial action when warranted.   The plaintiff's claim that on one occasion he did not know the results of an investigation, standing alone, cannot overcome the uncontroverted evidence of the effectiveness of MAE's policies and procedures.   *Cf. Watson v. Blue Circle Inc.*, 324 F.3d 1252 (11th Cir. 2003) (reversing grant of summary judgment because factual dispute existed over the extent of the investigation conducted and, therefore, the appropriateness of the action taken).

compensation claim and refused to re-hire them.  *See e.g., Williams v. Waste Management of Ill., Inc.,* 361 F.3d 1021, 1029-30 (7th Cir. 2004) ("If an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty.").

Many of the racial incidents described by the plaintiffs were directed at third parties, other than plaintiffs.[48]   Although harassment directed to others is properly considered in evaluating whether the working environment is hostile, these incidents have less impact than those directed at the plaintiffs.  *Bainbridge v. Loffredo Gardens, Inc.,* 378 F.3d 756 (8th Cir. 2004) (Affirming summary judgment where racial slurs were directed at third parties, not plaintiff, and many of the comments were merely overheard by the plaintiff). Additionally, many of the offensive comments and slurs described by the plaintiffs were reported to the plaintiffs by other employees (*i.e.,* the plaintiffs did not hear or see the incidents themselves).   Once again, while these incidents may be relevant in determining the existence of a hostile work environment, the court recognizes that the "impact of second-hand harassment" is obviously not as great as the impact of harassment directed at the plaintiff.  *Smith v. Northeastern Ill. Univ.,* 388 F.3d 559, 567 (7th Cir. 2004); *Gleason v. Mesirow Fin. Inc.,* 118 F.3d 1134, 1144 (7th Cir. 1997) (same); *Turner v. Honeywell,* 54 Fed.Appx 236, 2002 WL 31856359 (7th Cir. 2002)

---

[48]   Plaintiffs also seek to introduce hearsay statements from other employees.    Inadmissible hearsay may not be considered on a motion for summary judgment. *Macuba v. Deborer*, 193 F.3d 1316 (11th Cir. 1999; *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) (citing cases from six Circuits): *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir.1999);  *Pritchard v. Southern Co. Servs*., 92 F.3d 1130, 1135 (11th Cir.1996); *McMillian v. Johnson*, 88 F.3d 1573, 1584-85 (11th Cir.1996).   Any out-of- court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).  *Id.*  The hearsay statements proffered by the plaintiffs in deposition which do not fall within any exception have not been considered.

(Affirming summary judgment for employer in racial harassment case: "Given the totality of the circumstances, second-hand reports that racial slurs were overheard in the workplace are insufficient in this case to support a harassment claim.").

The harassment the plaintiffs did report (or that was reported by other employees) occurred over a period of several years.   The alleged racial slurs and symbols were mere offensive utterances or symbols and were not physically threatening.   Plaintiffs admit that the alleged harassment did not unreasonably interfere with their job performance: each testified that he satisfactorily performed all job assignments and that nothing prevented him from doing so. Indeed, each has had a successful career at MAE. Accordingly, there is insufficient evidence to conclude that the alleged harassment was sufficient to alter the terms or conditions of plaintiffs' employment. *Harris v. Forklift Systems, Inc.*, 510 US 17, 23 (1993).

Based upon a careful review of the incidents described in the *Findings of Fact* set forth above, the court concludes that the alleged harassment was not sufficiently "severe or pervasive enough to create an objectively hostile or abusive working environment – an environment that a reasonable person would find hostile or abusive."   *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75 (1998).   Alternatively, the Court concludes that MAE has established, by competent, uncontroverted evidence, it's affirmative defense to liability under *Fargher v.   City of Boca Raton,* 524 U.S. 715 (1998).   Accordingly, summary judgment on plaintiffs' hostile environment claim is due to be granted.

### Claims of Disparate Treatment Based Upon Race

The plaintiffs variously allege that they were discriminated against because of their race

in terms of starting pay, pay raises, promotions (including skill level progressions), demotions, discipline or job assignments in violation of Title VII and §1981.   To recover, plaintiffs must prove that MAE acted with discriminatory purpose.   *Clark v. Huntsville City Board of Education*, 717 F.2d 525, 529 (11th Cir.1983) .   To withstand summary judgment, plaintiffs bear the burden of producing sufficient evidence to show that MAE intentionally discriminated against them because of their race.   *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).   Plaintiffs can meet this burden with *direct* or circumstantial evidence.   In this case, plaintiffs have no direct evidence of race discrimination.   Consequently, the discrimination claims at issue in this are analyzed under  the three step procedure set forth in *McDonnell Douglas Corp. v. Green*,  411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

When the Court uses the *McDonnell Douglas* framework, it looks first to see if plaintiffs have made out a prima facie case of discrimination.  *Id*.   A *prima facie* case is established if plaintiffs show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under the Act."    *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978).  *Cooper v. Southern Company,* 390 F.3d 695, 723-724 (11th Cir. 2004) (citing *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973)).[49]    By establishing a prima facie case, plaintiffs create a rebuttable presumption that the employer unlawfully discriminated against them. *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714

---

[49]  The elements of a *prima facie* case for the specific employment decisions at issue are cited below in the discussion of those issues.

(1983).   MAE is entitled to summary judgment if the plaintiffs fail to produce sufficient evidence to support a *prima facie* case of race discrimination.   *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986); *Maynard v. Board of Regents,* 342 F.3d 1281 (11th Cir. 2003) (Summary judgment affirmed because plaintiffs failed to produce sufficient evidence to show that similarly-situated white employees were treated more favorably.)

If the plaintiffs do establish a *prima facie* case of discrimination, the burden shifts to MAE to   produce evidence to explain the legitimate non-discriminatory reason for the challenged employment decision(s).   *McDonnell Douglas,* 411 U.S. at 802. This rebuttal burden is "exceedingly light," *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988), and is one of production, not persuasion, as the ultimate burden of proving the existence of purposeful discrimination by a preponderance of the evidence remains on the plaintiffs at all times.   *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989).   If MAE produces such rebuttal evidence, "the presumption of discrimination is eliminated." *Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).   The plaintiff must produce evidence to show either that the proffered reason is untrue or, even if true, is a mere pretext for intentional race discrimination.   *Cooper,* 390 F.3d at 725-726 ("To survive summary judgment, the plaintiff must then "come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." . . . To show that the employer's reasons were pretextual, the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of

credence'.")

Plaintiffs cannot avoid summary judgment simply because they disagree with MAE's stated reason(s) for any employment decision(s).    The Court does not sit as a "super-personnel department" to "second-guess" an employer's non-discriminatory decisions.    *Id.; Harrington v. The Children's Psychiatric Center, Inc.*, 2003 WL 23356396 at *10-12 (S. D. Fla. 2003). *See also , Chapman v. Al Transport,* 229 F.3d 1012, 1050 (11th Cir. 2000)("Reasonable people may disagree about whether an employer acted correctly or fairly, "but such potential disagreement does not without more, create a basis to *disbelieve* an employer's explanation that it in fact based its decision" on its asserted non-discriminatory reasons.").    *See also Davis v. Con-Way Trans. Central Express, Inc.,* 368 F.3d 776, 785 (7th Cir. 2004) (Affirming summary judgment for the employer and stating that the court would not "sit as a super-personnel department nor second-guess [the employer's] business strategies where, as here, [the plaintiff] has provided no convincing evidence that the company lied about its [reasons for terminating the plaintiff]."); *Cofield v. Goldkist, Inc.,* 267 F.3d 1264, 1269 (11th Cir. 2001) (Affirming summary judgment for employer and holding: "We will not second-guess [the employer's] decision to emphasize qualifications over length of service," because the courts do not sit as super-personnel departments that re-examine the entities' business decisions."); *Salguero v. The City of Clovis,* 366 F.3d 1168, 1177(10th Cir. 2004) (same).

### Plaintiffs' Discrimination in Pay Claims.

**Mack** and **Wayne** claim that their starting pay at MAE was less than similarly-situated

76

white employees.[50]   To support a pay discrimination claim, a plaintiff must produce sufficient evidence to show: (1) he is black; (2) he received lower starting pay or lower pay raises than similarly-situated white employees; and (3) he was qualified to receive the higher pay.  *Cooper,* 390 F.3d at 735-36; *Meeks v. Computer Assoc. Int'l,* 15 F.3d 1013, 1019-20 (11th Cir. 1994). To support the second element (that "similarly-situated" white employees were paid more), the plaintiff must identify comparators who are "similarly situated in all relevant respects."  *Knight v. Baptist Hospital, Inc.,* 330 F.3d 1313, 1316 (11th Cir. 2003) (emphasis added).  *See also Wilson v. BE Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) ("The plaintiff and the employee [he] identifies as a comparator must be similarly-situated 'in all respects'. . . . The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."); *Jackson v. Bellsouth Telecommunications,* 372 F.3d 1250, 1274 (11th Cir. 2004) (Where plaintiff "failed to identify any specific non-minority employees who were treated differently in other similar cases," summary judgment is appropriate.); *Adams v. CBS Broadcasting, Inc.,* 61 Fed.Appx. 285, 288 (7th Cir. 2003) (To support a *prima facie* case of pay discrimination, the plaintiff must produce sufficient evidence to show that the persons outside the protected class who were paid more were "similarly-situated, in that they had similar experience, qualifications and duties.").

---

[50]  George had also asserted a disparate starting pay claim but conceded in his response to the summary judgment motion that his starting pay was in fact the same as the alleged comparator.  Carthen, McDonald and Mallory had similarly asserted that the pay raises they received during their employment were lower than similarly-situated white employees but abandoned such claims by failing to oppose MAE's motion as to such claims.

*Mack's Starting Pay Claim*

Mack complains that he received lower starting pay as an Apprentice than two white Apprentices (Joshua Frye and Matthew Wicks) and one white Level I Mechanic (Michael Musante).   MAE produced uncontroverted evidence to show that the two white Apprentices (Frye and Wicks)  were paid more than Mack because each had superior training in aeronautics and avionics, valuable skills for starting mechanics at MAE.   Additionally, one of the two Apprentices possessed an FAA license that is valuable to MAE.   In contrast, Mack had a trade school degree in electronics (not aeronautics or avionics) and he had no aircraft experience or training.   These differences fully support the difference in pay in each instance.   Consequently, Mack failed to show that the two white Apprentices were "similarly situated" to him in all respects.   *Adams, supra*, 61 Fed.Appx. 285, 288.   Moreover, the difference in relevant training and other qualifications is a legitimate non-discriminatory reason for the difference in pay.   *Memberu, v. Allright Parking Sys., Inc.,* 93 Fed.Appx. 603, 607 (5th Cir. 2004).   There is no evidence that MAE used these factors as a pretext for intentional race discrimination against Mack.

The third supposed comparator – Michael Musante (white) – was hired as an Avionics Mechanic I, a higher classification than Mack, based upon MAE's preliminary evaluation of his qualifications.   Musante was not hired as an Apprentice.   Musante's starting pay rate was consistent with his classification as a Level I Mechanic.[51]   Musante's 90-day skill level evaluation reflected that he was not performing at the requisite skill level of an Mechanic I, and

---

[51] Musante was paid more than the two white Apprentices for the same reason.

he was reclassified as an "Apprentice."   MAE followed its regular policy and did not lower Musante's pay.  Instead, he was given one year to achieve the Mechanic skill level, but he was not accorded any pay raises during that one year.   Thus, the difference in starting pay is fully explained by the fact that Mack was hired as an Apprentice while the alleged comparator was hired as a Mechanic.   The fact that MAE misjudged Musante's qualifications and misclassified him when he was hired does not show intentional race discrimination toward Mack.  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001), *cert denied.* 534 U.S. 576 (2001) (Pretext means more than a mere mistake by the employer; actions taken based on a mistaken non-discriminatory belief do not violate Title VII.). MAE is entitled to summary judgment on Mack's starting pay claim.

### Wayne's Starting Pay Claim

Wayne was hired as a Mechanic II at a starting wage rate of $13 per hour based upon his qualifications.   Wayne's starting pay claim is based solely upon his assertion that the Lead Mechanic who interviewed him misinformed him that Mechanic II was the highest skill level for Mechanics at MAE, and that Wayne would be hired as Mechanic II at a pay range between $14 and $16 per hour.   The undisputed evidence establishes that  "Senior" Mechanic is the highest classification and that Wayne was not hired as a Senior Mechanic.  Wayne was hired as Mechanic II.   Consequently, he was not hired at the highest skill level classification.   His starting rate of pay was well above the mid point for the pay range for Mechanic II.  He cites no "similarly-situated" white employees who were treated more favorably than he.  For that reason alone, his

claim fails.   *Cooper,* 390 F.3d at 741-43.   Moreover, MAE has articulated legitimate non-discriminatory reasons for its actions, and Wayne has adduced no evidence that those reasons are a pretext for race discrimination.   MAE is entitled to summary judgment.

**Mack's, Wayne's & Mallory's Promotion**
**(Skill Level Progression) Claims.**

MAE promotes mechanics from an entry-level Apprentice position to Mechanic I, from Mechanic I to Mechanic II and from Mechanic II to Senior Mechanic.   These promotions are not competitive promotions; all employees who satisfy the requirements for progression to the next skill level are eligible for promotion.   Skill level progression is based upon the length of employment in the position, performance evaluations, attendance and disciplinary records.   (Exh. 37, Wellington Dec. ¶16).

To support a *prima facie* case on a claim involving a progressive non-competitive promotion, a plaintiff must present sufficient evidence to show: (1) he is black; (2) he was qualified for progression to the next level; (3) he did not receive the job; and (4) "similarly-situated" white employees received more favorable consideration.   *Harris v. Secretary, United States Dep't of the Army*, 119 F.3d 1313, 1320-1321 (8th Cir. 1997); *Cooper,* 390 F.3d at 741-43.   To show that he met the qualifications for progression to the next skill level, the plaintiff must produce evidence to show that he met his employer's reasonable qualifications for the position. *Cooper,* 390 F.3d at 743 (The plaintiff's own opinion of her qualifications for progression was not sufficient to overcome the judgment of her qualifications by the employer.).

***Mack's Progression from Apprentice to Mechanic Claim.***

Mack first claims that he was not promoted from "Apprentice" to "Mechanic I" following his initial six-month evaluation, while three white Apprentices (Matthew Wicks, Joshua Frye and Larry Givens) were promoted after their initial six-month evaluation.   The uncontroverted facts establish that Mack was not eligible for promotion at six months under MAE's guidelines and that Givens, Frye and Wicks were.

To be eligible for promotion from Apprentice to Mechanic I after the first six months, the Apprentice must have an average performance evaluation score of at least "5.0," and must have a satisfactory attendance and disciplinary record.   After the first six months, Mack's monthly performance evaluation average was "4.9"; Givens' average was "6.0"; Frye's average was "5.0"; and Wicks' average was "5.2."   Additionally, Frye and Wicks had superior aeronautics and avionics training from a recognized aeronautical school and Frye possessed an FAA A&P license.   Consequently, the alleged comparators are not "similarly-situated," and MAE followed its established promotion guidelines in making the promotion decisions.   *Cooper*, 390 F.3d at 740 (The plaintiff's own opinion of [his] qualifications for progression was not sufficient to overcome the judgment of [his] qualifications by the employer.).   Alternatively, those facts establish legitimate non-discriminatory reasons for MAE's decisions regarding each employee. There is no evidence that MAE's stated reasons are pretextual.   Accordingly, MAE is entitled to summary judgment.

Mack next complains that he once again was passed over for promotion from Apprentice

to Mechanic I after one year of employment (February 2002), and that several months later in August 2002, he discovered that the six-month performance evaluation that should have been conducted in February to support his promotion was not performed. Mack offers no evidence to show that his Lead or Department Supervisor intentionally failed to perform the six-month evaluation because of Mack's race. Indeed, Mack testified that both always treated him fairly. (Exh. 58, Mack at 40-41). Shortly after Mack and a Human Resources secretary discovered his missing performance evaluation in August 2002, Mack was promoted to Mechanic I. Three other black Avionics Apprentices who were hired at approximately the same time as Mack were evaluated on time and were promoted from Apprentice to Mechanic I based on timely second six-month evaluations. (Exh. 36, Tan Dec., ¶¶21-23).

Absent any other evidence of discrimination,[52] MAE's mistake (the inadvertent failure to perform the six-month evaluation to support Mack's promotion) is a legitimate non-discriminatory explanation for Mack's failure to be promoted to Mechanic I sooner.

Accordingly, Mack bears the burden of producing evidence that the mistake was a pretext, or cover-up, for intentional race discrimination. *Williams v. Potter,* 331 F. Supp. 2d 1331 (D. Kan. 2004) (When an employer proffers "mistake" as a legitimate, non-discriminatory reason for an employment action, the plaintiff must produce evidence to show that discrimination was the real

---

[52] Approximately one year after he was promoted, Mack questioned his then-Lead Quinn Holbrook why his progression to Mechanic I had been delayed 18 months and Holbrook replied: "You're the wrong fucking color." Lead Holbrook played no part in Mack's performance evaluations for the promotion decision a year earlier. His comment, which Holbrook sought to explain as a "joke," is not direct evidence of discrimination with regard to the promotion a year earlier. *Cooper v. Southern Co.,* 390 F.3d 695, 724 n.15 (11th Cir. 2004) (Direct evidence is a "frank admission" *by the decisionmaker* showing that the decision at issue was based upon race.); *Schoenfeld v. Babbit,* 168 F.3d 1257, 1266 (11th Cir. 1999).

reason motivating the employer's decision.).  For example, in *Hawkins v. Groot Ind., Inc.,* 2000 WL 22078382 (N.D.. Ill. 2003), the court held that the employer's voluntary action in promoting the plaintiff and awarding back-pay to him upon discovering an error, coupled with the undisputed fact that other blacks were promoted on time, supported "mistake" as a legitimate, non-discriminatory reason for plaintiff's failure to be promoted.  *See also Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 (11ᵗʰ Cir. 2001) *cert denied*, 534 U.S. 976 (2001) (Pretext means more than a mere mistake by the employer; actions taken on a mistaken non-discriminatory belief do not violate Title VII.)*; Kidd v. MBNA Am. Bank NA,* 224 F. Supp. 2d 807, 811-12 (D. Del. 2002), *aff'd* 2004 WL 603448 (3ʳᵈ Cir. 2004).[53]   Here, there is no evidence that MAE's mistake was a cover-up for intentional race discrimination, and MAE's motion for summary judgment is due to be granted.

***Wayne's Progression to Senior Mechanic Claim.***

Wayne claims that MAE failed to promote him from Mechanic II to Senior Mechanic as quickly as five white employees who were hired after him.  The uncontroverted facts refute his claim.

Under MAE's standard promotion procedures, a Mechanic II like Wayne is eligible for progression to Senior Mechanic after 30 months if his or her average monthly performance evaluations are "5.8 or above."   After Wayne had been employed for 30 months, his average

---

[53]   As additional facts came to light after Mack filed an EEOC charge and subsequent lawsuit, MAE calculated and recalculated the wages he lost as result of the delay in his promotion wrought by the failure to perform timely his evaluation.  Mack has been fully compensated for the back pay.  (Wellington Dec.)

score was below "5.8" and he was thus not eligible for the promotion.  A Mechanic II is eligible for promotion to Senior Mechanic after 42 months of employment if his or her average monthly performance evaluations are between "4.0" and "5.7."  As Wayne approached 42 months of employment with MAE, his average monthly performance evaluation score met that requirement, and he was notified that he was promoted to Senior Mechanic.  Wayne inexplicably quit after he discovered that his Department Supervisor had reviewed his personnel file in conjunction with the promotion decision.[54]

Wayne's effort to compare himself to five Senior Mechanics who were hired after he was hired (one Hispanic, one black, one Asian and three white co-workers) is unavailing.  Each of these employees was **hired** as a Senior Mechanic based upon substantial direct experience and training in the work MAE performs.  Like plaintiffs Jon George and Theodore Carthen, each was **hired** as a Senior Mechanic, subject to the new-hire 90-day performance evaluation to confirm he was performing at the Senior Mechanic skill level.  Like plaintiffs George and Carthen, each performed at that level and each was confirmed as a Senior Mechanic after 90 days.  Wayne was not similarly-situated with the five Senior Mechanics.  *Cooper v. Southern Co., supra.*  Even if he was, MAE has articulated legitimate non-discriminatory reasons for its actions, and Wayne has adduced no evidence that the reasons are pretextual.  Moreover, hiring three black employees as Senior Mechanics based upon their previous experience and training (including two plaintiffs in this lawsuit) belies any suggestion that race was a factor in these decisions.  MAE deserves

---

[54]  The same Department Supervisor recommended that Wayne be promoted to Senior Mechanic three months before the normal 42 month threshold.  Wayne does not explain why he would have objected to his Department Supervisor reviewing his personnel file.

summary judgment on Wayne's skill level promotion claim.

***Mallory's Progression to Mechanic II Claim.***

Mallory complains that he was denied promotion from Mechanic I to Mechanic II because of his race during the time he worked in the Interiors Department between February 2001 and May 2003.  He does not identify any "similarly-situated" white Mechanics who progressed more quickly than he, but he speculates "that there are some [white Mechanics] that started after me that probably got promotions or raises a lot faster than I did."   Mallory's speculation is insufficient to avoid summary judgment.

Mallory was eligible for promotion from Mechanic I to Mechanic II in Interiors after he worked two years as a Mechanic I if he achieved an average monthly evaluation of "4.0" to "5.7" and if his attendance merited the promotion.  Although his evaluation average met the threshold, Mallory had significant attendance problems (primarily tardiness) evidenced by a "below satisfactory" performance evaluation of "3" on attendance and counseling for the same reason. For that reason, Mallory was not eligible for promotion.

Mallory claims that his race was the reason for the lower performance evaluation and counseling for poor attendance.  However, he was tardy at least 50 times from January through mid-May 2003.    Moreover, the undisputed evidence establishes that a white co-worker, Gaston Irby, who worked for the same Lead and Supervisor, received a low performance evaluation ("3") at that same time for the same reason. Not only did Mallory fail to identify similarly-situated white employees who were treated more favorably than he, his "unsatisfactory" attendance was

85

a legitimate non-discriminatory reason for his failure to progress to Mechanic II. *See e.g., Wade v. Lerner New York, Inc.,* 243 F.3d 319, 324-325 (7th Cir. 2001) (Affirming summary judgment on grounds that different attendance records constituted a legitimate, non-discriminatory reason for failure to promote.); *Stokes v. Aetna Insulated Wire Co.*, 145 F.3d 1326 (4th Cir. 1998) (table); *Cf. Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 577-8 (16th Cir. 2004) *cert denied* 2005 WL 406097 (2005) (In disparate impact case, court found employer had legitimate business reason for requiring near perfect attendance to be eligible for promotion).   Mallory has adduced no evidence of pretext and MAE is entitled to summary judgment.

### George's Denial of Promotion Claims

George claims that he was denied a competitive promotion to higher position because of his race.[55]   To support a *prima facie* case of discriminatory promotion, the plaintiff must produce sufficient evidence to show: (1) he belongs to a racial minority; (2) he was qualified and applied for a position the employer sought to fill; (3) he was denied the position; and (4) an individual outside the protected group was selected.  *McDonnell Douglas Corp.,* 411 U.S. at 802; *Cooper,* 390 F.3d at 724 n.16.   George has failed to produce sufficient evidence to raise a *prima facie* case of race discrimination.

According to George, he applied for both vacant Project Manager and APG Lead jobs. Human Resources received and processed George's application for the Lead position, and George was promoted to Lead in November 2003.   However, MAE has no record of George

---

[55]   To the extent Carthen ever alleged that he was discriminatorily denied  promotion to a Lead position, he abandoned that claim by failing to response to MAE's motion for summary judgment concerning same.

applying for the project manager position, and he was not considered for the job for that reason. There is no evidence to suggest that MAE intentionally misplaced or discarded George's application for the Project Manager position because of his race.

Even if George's unsupported testimony is sufficient to raise a genuine issue of fact on whether he applied for the Project Manager position, the uncontroverted facts establish that MAE's failure to consider George's application was an inadvertent mistake, which is a legitimate non-discriminatory reason for the failure to consider and promote him.   George has failed to adduce any evidence of pretext.  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1251, 1261 (11th Cir. 2001) *cert denied* 534 U.S. 976 (2001) (Pretext means more than a mistake by the employer; action taken based upon mistaken non-discriminatory beliefs do not violate Title VII.); *Lee v. GTE Fla., Inc.,* 226 F.3d 1249, 1253 (11th Cir. 2000), *cert. denied.* 533 U.S. 958 (2001) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by [unlawful considerations].");  *Alexander v. Fulton County Ga.,* 207 F.3d 1303, 1339 (11th Cir. 2000) (same).   Moreover, the fact that MAE selected George for promotion to Lead is evidence that it had no intent to discriminate against George on account of his race.

### McDonald's Discriminatory Discipline Claim.

McDonald claims that he was unfairly disciplined because of his race on two occasions: he was suspended without pay for three days after he was involved in an incident that resulted in substantial damage to an aircraft; and he was given a disciplinary report (written warning) for insubordination.   To support a *prima facie* case based on discriminatory discipline, McDonald

87

must produce sufficient evidence to show: (1) he is black; (2) he was subjected to discipline that rises to the level of an adverse employment action; (3) he was accused of misconduct; and (4) similarly-situated employees outside the protected class were treated more favorably. *Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1311 n.6 (11th Cir.), *superseded in part on other grounds on rehearing*, 151 F.3d 1321 (11th Cir. 1998), *Id.* McDonald cannot support a *prima facie* case simply by disputing his alleged violation of company rules or policies. He must produce evidence to show that a similarly-situated white employee who disputed a violation was, in fact, treated better. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *Cooper*, 390 F.3d at 729 (The relevant issue here is not whether the plaintiff actually committed the alleged violation, but rather whether the decisionmaker honestly believed the plaintiff committed the violation.); *Lucas v. Chicago Trans. Auth.,* 367 F.3d 714 (7th Cir. 2004) (Affirming summary judgment on the ground that a negative evaluation or written disciplinary warning does not rise to the level of an adverse employment act unless it results in a tangible job consequence); *Burkett v. Glickman*, 327 F.3d 658 (8th Cir. 2003) (Affirming summary judgment for the employer on the ground that a letter of reprimand did not constitute an adverse employment action.). McDonald has failed to produce sufficient evidence to raise a *prima facie* case of race discrimination with regard to discipline.

McDonald was disciplined with a three-day unpaid suspension in 2003 after an incident involving damage to an aircraft. MAE conducted an investigation and concluded that McDonald and James Winkler (white) were partially at fault and *both* were suspended for three days without pay for that reason. The investigation did not conclude that two other employees, Kevin Clark

88

(white) and Charlotte Farmer (white) were at fault.  They were not disciplined for that reason.[56]

McDonald has failed to show that a similarly-situated white employee was treated more favorably than he.  For that reason alone, summary judgment is appropriate.          McDonald next claims that he was discriminatorily issued a disciplinary report for insubordination.  Not only did MAE investigate McDonald's ensuing complaint that the discipline was unfair and revoke the discipline, the disciplinary warning does not rise to the level of an "adverse employment action" necessary to support a discrimination claim.

> There must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action; otherwise every reprimand or attempt to counsel an employee could form the basis of a federal suit.

*Lucas v. Chicago Trans. Auth.*, 367 F.3d 714 (7th Cir. 2004) (Affirming summary judgment for the employer.); *Burkett v. Glickman*, 327 F.3d 658 (8th Cir. 2003) (Affirming summary judgment on the grounds that a letter of reprimand did not constitute an adverse employment action.).  MAE is entitled to summary judgment on this claim.

### George's Demotion from "Acting" Lead Claim.[57]

Generally, George could support a *prima facie* case of discriminatory demotion by producing sufficient evidence to show: (1) he is black; (2) he was qualified for the job in that he

---

[56]  McDonald did not identify Winkler (white) in his *Amended Complaint* (*Amended Complaint* ¶66).  McDonald offers no evidence that MAE did not reasonably and in good faith conclude that McDonald and Winkler were at fault, while Clark and Farmer were not.  *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004) (The relevant issue is not whether the plaintiff actually committed the misconduct, but whether the decisionmaker honestly believed that he had done so.); *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000).

[57]  Wayne abandoned his demotion from "Acting" Lead claim when he failed respond to MAE's motion for summary judgment on same.

was performing under his employer's reasonable performance expectations; (3) he was demoted; and (4) a similarly-situated white employee was treated more favorably than he. *Mallory v. Noble Correctional Inst.,* 45 Fed.Appx. 463, 471 (6th Cir. 2002).  In this context, a "similarly-situated" employee is one "who was subject to the same standards of conduct, and who has engaged in the same conduct without differentiating or mitigating circumstances." *Maynard v. Board of Regents of the Univ. of Fla. Dept. of Ed.,* 342 F.3d 1281, 1289 (11th Cir. 2003).  To be "similarly-situated," the comparator generally must have committed the same or an equivalent offense while working under the same supervisor.  *Mallory,* 342 F.3d 1281 at 1289  (Summary judgment for employer affirmed when comparator not "similar.").

George sought to identify several white Leads who allegedly engaged in the same kind of conduct that resulted in his removal from an Acting Lead position and who were not relieved of their jobs.  However, the white Leads and Acting Leads George has identified were not under the supervision of the same Program Manager who relieved George of his Acting Lead job at the time of the supposedly comparable incident(s).  Based on that fact, they are not similarly-situated.  *Maynard,* 342 F.3d 1281 at 1289; *Mallory,* 45 Fed.Appx. at  471.

George's effort to compare himself to a white permanent Lead who was under the direction of the same Program Manager approximately one year later, and who retained his Lead position after he was disciplined for his involvement in an incident resulting in damage to an aircraft, is similarly unavailing.  MAE presented uncontroverted evidence that the same considerations do not dictate removal of a permanent Lead from his position for a single incident, while the decision to remove a "Acting" Lead is a fairly common occurrence.

90

Moreover, George was removed for a combination of reasons, not for a single incident of damage to an aircraft, while the other Lead was charged with an isolated accident.   For these reasons, George and the permanent Lead are not similarly-situated.   *Knight v.  Baptist Hosp., Inc.*, 330 F.3d 1313, 1316 (11th Cir.  2003); *Wilson v.  BE Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir.  2004).

        In any event, MAE has produced uncontroverted evidence of the legitimate non-discriminatory reasons for the decision.   Newly-promoted Project Manager Ben Morris conducted an ongoing evaluation of Lead and Supervisors working on the new FedEx DC-10 Program.   Based upon his evaluation, he concluded that George's performance did not merit continuation as an Acting Lead, and he was replaced for that reason.[58]   George has adduced no evidence that Morris' reasons are pretextual.   *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir. 1997) ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."); *Harrington v. The Children's Psychiatric Ctr., Inc.,* 2003 WL 23356396 (S.D. Fla. 2003) (Confronted with the employer's legitimate non-discriminatory explanation that the employee's performance justified the employment decision at issue, "[T]he analysis of pretext . . . must be focused on the employer's beliefs, and not the employee's own perceptions of [his] performance.   Thus, the way the employer has acted based on a belief that the performance of one candidate was superior to the performance of the other,

---

[58]  George disagrees with the Program Manager's evaluation of his performance.   Nevertheless, an employee's evaluation of his own performance is irrelevant.   The issue is whether the employee is performing up to his *employer's* expectations, not his own.   *E.g., Holifield, supra; Bethel v. Porterfield,* 293 F. Supp. 2d 1307 (S.D. Ga. 2003) *aff'd* 2004 WL 1800649 (11th Cir. 2004) (table); *Dorrego v. Public Health Trust of Miami-Date County,* 293 F. Supp. 2d 1274 (S.D. Fla. 2003).

and employee's assertion of his own superior performance is insufficient to defeat summary judgment in the absence of other evidence.").    For these reasons, summary judgment is appropriate.

### Wayne's Job Assignments and
### Required Time Off Claims.

Wayne complained that he was discriminatorily assigned work that was beneath his skill level and that he was given jobs involving significant responsibility to "set [him] up for failure." Wayne satisfactorily performed the jobs.    He does not identify any adverse action he suffered as a consequence of these job assignments, which do not by themselves constitute adverse employment action.    Because of that, his claim is insufficient.    *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371(4th Cir. 2004) *cert denied* 125 S. Ct. 423 (2004)   (Affirming summary judgment for employer, the court noted: "The mere fact that a new job assignment is less appealing to the employee, however, does not constitute an adverse employment action. [Citation omitted].    A 'reassignment' can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect.")*; Mylett v. City of Corpus Christi,* 97 Fed.Appx. 473, 476 (5th Cir. 2004) (Affirming summary judgment for employer: "Undesirable work assignments are not adverse employment actions."), *quoting, Southard v. Texas Bd. of Crim. Justice*, 114 F.3d 539, 555 (5th Cir.1997). .   MAE is entitled to summary judgment.

Wayne next claims that he and other black employees were required to take credit time or   time off from Lead Jimmy Prestage's (black) crew when work was slow, while white

employees were assigned to perform jobs elsewhere.   MAE's records show no statistical basis for concluding that black employees were required to take time off more often than white employees under similar circumstances.   Wayne admittedly has no other evidence to suggest that race was a factor.   In sum, there is no evidence to support Wayne's claim that black employees were treated less favorably than white employees with regard to time off or credit time.   *See generally Cooper v. Southern Company,* 390 F.3d at 725; *Clark v. Huntsville City Board of Education*, 717 F.2d 525, 529 (11th Cir.1983); *Harrington v. The Children's Psychiatric Center, Inc.*, 2003 WL 23356396 (S. D. Fla. 2003).

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that no material issues of fact exist and that MAE is entitled to judgment in its favor as a matter of law on all claims raised by the plaintiffs.   It is therefore **ORDERED** that defendant's motion for summary judgment be and is hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendant, ST Mobile Aerospace Engineering, Inc., and against the plaintiffs, Claudell L. Mack, Theodore Carthen, Jon Keith George, Earl J. Mallory, Clarence McDonald III, and Damon Wayne, the plaintiffs to have and recover nothing of the defendant.   Costs are taxed against the plaintiffs.

**DONE** this 26th day of July, 2005.

_____s/ W. B. Hand_____
SENIOR DISTRICT JUDGE